In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 19-1857

DUSTIN JAMES,

*Plaintiff-Appellant,*

*v.*

DEBORAH HALE,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:15-cv-01335-JPG-MAB — **J. Phil Gilbert**, *Judge.*

———————————

ARGUED FEBRUARY 14, 2020 — DECIDED MAY 14, 2020

———————————

Before RIPPLE, SYKES, and SCUDDER, *Circuit Judges.*

SYKES, *Circuit Judge.* It is axiomatic that the first step in the summary-judgment process is to ask whether the evidentiary record establishes a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). To decide this question, the judge may disregard an affidavit that attempts to create a sham issue of fact. The "sham affidavit rule" exists in every circuit. This case illustrates the wisdom of the rule.

Dustin James, a former pretrial detainee at the St. Clair County Jail in Belleville, Illinois, filed a pro se civil-rights lawsuit against Deborah Hale, the administrator of the jail infirmary, accusing her of inadequately treating his medical needs.[1] He later acquired counsel, and significant discovery followed, including the production of jail infirmary and outside medical records that contradicted allegations in his complaint.

Through counsel James obtained leave from a magistrate judge to file an amended complaint, but the factual section simply repeated the allegations in the original pro se version. In a subsequent deposition, James contradicted those factual assertions. When Hale moved for summary judgment, James responded by swearing out an affidavit incorporating by reference the allegations in the amended complaint.

The magistrate judge disregarded the affidavit, as well as an affidavit submitted by James's mother, and recommended that the district court grant the motion. The district judge excluded the affidavits under the sham-affidavit rule and entered summary judgment for Hale.

We affirm. Not only is James's affidavit a sham, it was an improper attempt to convert the allegations in the complaint into sworn testimony to avert summary judgment. The exclusion of his mother's affidavit was a mistake, but the error was harmless because she added nothing of substance.

---

[1] Hale's first name is spelled "Debra" in the district court's docket and final order but is in fact spelled "Deborah" according to the disclosure statement and her deposition.

The constitutional claim lacks factual support, so summary judgment in Hale's favor was proper.

## I. Background

On the evening of January 11, 2015, Dustin James, a pretrial detainee in the St. Clair County Jail, was assaulted by another inmate and sustained severe facial injuries. At 11:15 p.m. he was taken to the jail infirmary. His civil-rights suit centers on the response by Deborah Hale, the jail's Health Services Administrator. We ask the reader's patience as we provide the details and dates; their importance will become clear later.

James's injuries were serious enough to send him to the hospital. Just before midnight he arrived in the emergency room at St. Elizabeth's Hospital where he received a CT scan and was diagnosed with a left zygomatic arch fracture and facial laceration. He received two morphine injections for pain and the laceration was sutured. The ER doctor's discharge instructions required removal of the stitches in five days and recommended a follow-up visit with an otolaryngologist (known colloquially as an "ENT" specialist). The doctor also referred James to Dr. Paul Szewczyk, an ophthalmologist, for follow-up care. James arrived back in the jail infirmary at 3 a.m. on January 12.

Nursing staff cared for James until he was seen on January 13 by a jail physician, who prescribed Motrin for ten days, referred James to an ophthalmologist and an ENT, and kept him in the jail infirmary. Three days later James was transported to Quantum Vision Centers where Dr. Szewczyk examined him and determined that "[n]o treatment [was]

currently required." The doctor recommended a follow-up visit in one week.

Back at the jail, Nurse Jennifer Sabaleski removed the sutures in James's eyebrow on January 19. She also noted his complaint of facial numbness. On January 24 she documented James's request for an extension of his pain medication. The next morning she examined him; he voiced no complaints of pain. James later complained of recurring facial pain to a different nurse, and a jail physician prescribed ten more days of Motrin.

In accordance with the discharge instructions, James was examined by an ENT at Archview Medical Specialists on January 26. The doctor recommended a referral to a plastic surgeon for a possible reduction of the left orbital rim. Two days later at a follow-up appointment at Quantum Vision, Dr. Szewczyk noted that James's vision, alignment, eye movements, retina, and optic nerve were all doing well. He also recommended a referral to a plastic surgeon for a complaint of cheek numbness.

On February 19 James asked to see Hale, complaining of facial pain. He requested more pain medication, but Hale told him that there was no current order for ibuprofen and he would need to see a doctor to obtain a new prescription. She noted facial swelling and planned to refer him to a doctor, but the on-site physician wasn't at the jail that day. James had an appointment scheduled with an off-site specialist the next day, so Hale did not submit a physician referral.

The following morning—Friday, February 20—James was transported to a clinic connected with St. Louis Univer-

sity Hospital where Dr. Bruce Kraemer, a plastic surgeon, examined him. James denied having any visual disturbances or eating difficulties. The exam revealed an elevated temperature, facial swelling, and pain; however, Dr. Kraemer noted no overt evidence of infection other than the facial swelling. He ordered another CT scan because he apparently did not have access to the earlier one, so James was taken to radiology for that test. James was supposed to see Dr. Kraemer after the scan was completed, but he never returned to the clinic.

After reviewing the results of the CT scan later that day, Dr. Kramer made the following observations in a 6:42 p.m. addendum to his examination notes:

> Given the paucity of radiographic findings[,] his swelling[, and] his temperature[,] I called the jail where he is residing[.] I left a message with the medical Department that I would recommend putting him on Cipro 500 mg twice daily[,] and I gave them my cell number to call me over the weekend if they have questions and we will try to reach them again Monday morning.

The addendum also reflects a recommendation for a follow-up visit in two weeks.

As promised, on Monday morning, February 23, someone from Dr. Kraemer's office called the jail infirmary and recommended that James be given Cipro, an antibiotic. He received the first dose that evening during the next scheduled medication pass. He was released from custody the next day.

In December 2015 James filed a pro se civil-rights com-
plaint against Hale seeking damages under 42 U.S.C. § 1983
for denial of medical care in the jail.[2] He claimed that on or
about January 20, he reported to Hale that his eye was nearly
swollen shut, his face was numb, and he was hardly able to
open his mouth on one side. He alleged that she gave him a
"sick call form" with instructions to fill it out, and he did so
repeatedly between January 20 and 28 but "was never seen
by any medical staff." He alleged that his mother, Patricia
Powell, called the jail the following week and spoke to Hale,
but he "still received no medical attention to the problems at
hand or was even seen by medical staff." He further alleged
that he woke up on February 20 with pain and facial swell-
ing and requested to see Hale, but when she saw him, she
"stated to him he was fine." He alleged more generally that
between January 20 and February 28 he suffered from vision
loss, pain, facial swelling, and an inability to eat due to
Hale's "medical neglect." The complaint sought $100,000 in
compensatory damages and $5,000 in punitive damages. The
case was referred to a magistrate judge in January 2016.

James acquired counsel in January 2017, and counsel ob-
tained James's jail infirmary and outside medical records
through discovery. The records contradicted or clarified the
allegations in the complaint in numerous respects. A sample:

- In his complaint James alleged that on or about
  February 20, he woke up with pain and facial swelling

---

[2] James also sued St. Clair County Jail Captain Thomas Trice alleging
that he punished him with segregation time in retaliation for seeking
medical care. The claim later settled and was dismissed with prejudice.

and requested to see Hale. The jail infirmary records clarified that these events took place on February 19.

• The complaint alleged that James repeatedly complained of facial pain and swelling between January 20 and February 28 and received no medical attention. The jail infirmary records show that members of the nursing staff conducted daily rounds during this time period and dispensed ibuprofen to him three times a day between January 13 and 23, when his initial ten-day prescription expired; he was examined by Nurse Sabaleski on January 24 and 25, and a jail physician thereafter extended his ibuprofen prescription for ten more days; he was examined on January 26 and 28 by an outside ENT and ophthalmologist, respectively, and by Dr. Kraemer (the plastic surgeon) on February 20.

• In his complaint James alleged that from January 20 to February 28 he suffered from vision loss and was unable to eat. The medical records show that he denied suffering from either of these problems at his February 20 appointment with Dr. Kraemer.

• The complaint alleged that the January 12 CT scan revealed a possible concussion. The medical records reflect no concussion.

Notwithstanding these contradictions and clarifications, in July 2017 James—through his counsel—obtained leave to file an amended complaint in which he simply repeated the factual allegations from his original complaint. In his February 2018 deposition, James directly contradicted many of the allegations in the amended complaint.

Hale eventually moved for summary judgment. In response James attached his deposition testimony, Dr. Kraemer's deposition testimony, a copy of the amended complaint, and an expert report by Dr. Michael Angarone, D.O. James later moved for leave to supplement his response with two affidavits—one from himself and one from his mother, Patricia Powell. The magistrate judge granted the motion. Both affidavits simply incorporated by reference factual allegations from the amended complaint, directly contradicting James's deposition testimony and the infirmary and outside medical records.

The case was then transferred to a different magistrate judge who disregarded the affidavits, pointing out that they merely cross-referenced allegations in the amended complaint and reasoning that it was not his job to construct James's argument from the record. Based on the remaining evidence, the magistrate judge found no factual support for James's claim and recommended that the district court grant the summary-judgment motion.

The district judge disagreed with some of the magistrate judge's reasoning but ultimately adopted his recommendation. Relying on our decision in *Ford v. Wilson*, 90 F.3d 245, 247 (7th Cir. 1996), the judge determined that the affidavits were not impermissible merely because they simply swore to the truth of allegations in the amended complaint. The judge instead excluded the affidavits under the sham-affidavit rule. Examining the remainder of the evidence, the judge held that no reasonable jury could find that Hale's actions were objectively unreasonable in violation of James's right to due process. The judge accordingly entered summary judgment in Hale's favor.

## II. Discussion

James challenges the exclusion of the two affidavits and the judge's decision on the merits. We review evidentiary rulings for an abuse of discretion. *United States v. Trudeau*, 812 F.3d 578, 590 (7th Cir. 2016). We review the judge's summary-judgment order de novo, construing the record in the light most favorable to James and drawing all reasonable inferences in his favor. *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017).

### A. *Ford v. Wilson*

Before turning to the sham-affidavit rule, we pause to address the district court's application of our decision in *Ford v. Wilson*. The judge assumed that *Ford* generally authorizes a plaintiff to convert allegations in a complaint into an affidavit that is capable of defeating summary judgment. In other words, if James's affidavit hadn't turned out to be a sham, the district judge would not have adopted the magistrate judge's recommendation to disregard it. Still, the judge disapproved of James's use of this "conversion" technique, particularly since he was represented by counsel. He suggested that the tactic "makes a mockery of how summary judgment is supposed to work."

The judge's point is well-taken, so we take this opportunity to clarify *Ford*'s scope. Roy Ford filed a verified pro se civil-rights complaint against a police officer who arrested him after a traffic stop. The officer moved for summary judgment, and the judge granted the motion because Ford had not submitted an affidavit or other evidence in opposition. *Ford*, 90 F.3d at 246–47. Although we ultimately affirmed the judgment, we reasoned that because Ford had

verified his complaint, some of its contents "were affidavit material." *Id.* at 247.

We began our analysis with the general principle that a plaintiff may not rely on mere allegations or denials in his complaint when opposing a properly supported motion for summary judgment. *Id.* at 246–47. We explained, however, that a verified complaint—signed, sworn, and submitted under penalty of perjury—can be considered "affidavit material" *provided* the factual allegations otherwise satisfy the affidavit criteria specified in Rule 56 of the Federal Rules of Civil Procedure *and* the declarant complies with 28 U.S.C. § 1746, which sets forth the requirements for verification under penalty of perjury. *Id.* at 247.

We took pains, however, to sound a cautionary note. Because this tactic undermines the function of Rule 56, we pointedly said that "[w]e do not mean to commend the practice." *Id.* We explained that Rule 56 requires "the submission of evidentiary material in response to a motion for summary judgment as a means of sharpening the issues, so that the judge can determine just what if anything must be tried." *Id.* Merely pointing to assertions in a verified complaint "is bound to make the identification of genuine issues of material fact difficult, complicating the work of the judge." *Id.* Still, we did not think that this "departure from proper practice" was "so egregious or such a burden on the court as to warrant the fell sanction of dismissal" in Ford's case, especially since he was litigating pro se and had not been warned against this approach.

Importantly, every out-of-circuit case we relied on for support in *Ford* dealt with a litigant who was not represented by counsel when he verified his complaint. *See Colon v.*

*Coughlin*, 58 F.3d 865, 868 (2d Cir. 1995); *Schroeder v. McDonald*, 55 F.3d 454, 456 (9th Cir. 1995); *King v. Dogan*, 31 F.3d 344, 345 (5th Cir. 1994). Not once in the 24 years since *Ford* was decided have we allowed a represented party to resist summary judgment by submitting an affidavit swearing to the allegations in the complaint after significant discovery. We see no reason to make this case the first. *Ford* struck a delicate balance between issue clarification and equity. James asks us to upset this balance, insisting that we accept an affidavit that reaches *back* past *extensive discovery* conducted with the assistance of counsel to repeat assertions in a pro se complaint. That approach obscures rather than clarifies the determination of material factual issues. In addition, the equities are quite different when a party is represented by counsel.

In sum, *Ford* should not be understood as a general authorization for a represented plaintiff to defeat summary judgment after extensive discovery by the simple expedient of swearing in an affidavit that the allegations in the complaint are true. There is no authority in this circuit for such "reach back" complaint verification.

## B. Sham-Affidavit Rule

The principal function of summary judgment is to prevent unnecessary trials by screening out factually unsupported claims. *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). Rule 56(c)(4) serves this screening function by permitting a party to use an affidavit or declaration to support or oppose a motion for summary judgment only if the affidavit (1) attests to facts of which the affiant has "personal knowledge"; (2) "set[s] out facts that would be admissible in evidence"; and (3) "show[s] that the affiant or

declarant is competent to testify on the matters stated." Similarly, Rule 56(h) permits a judge to sanction a party who presents an affidavit "in bad faith or solely for delay." FED. R. CIV. P. 56(h). Rule 56 thus requires a judge to scrutinize the substance of an affidavit offered in response to a summary-judgment motion to determine whether a reasonable jury could rely on the factual statements it contains. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 252 (3d Cir. 2007).

In furtherance of this screening function and in support of a judge's duty at the summary-judgment stage, every federal court of appeals permits a judge to disregard a "sham" affidavit—typically an affidavit that contradicts prior deposition testimony. *See Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir. 1994); *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 498 (Fed. Cir. 1992); *Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703, 706 (3d Cir. 1988); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984); *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657–59 (11th Cir. 1984); *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364–65 (8th Cir. 1983); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975); *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 577–78 (2d Cir. 1969).

In this circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018). We also disregard an

affidavit that contradicts a statement made under penalty of perjury, even if the statement was not made in the course of litigation. *See United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448, 466 (7th Cir. 2005) (applying the sham-affidavit rule to statements in an affidavit that contradicted representations in the affiant's bankruptcy filing and tax returns). The organizing principle of our sham-affidavit practice is simply stated: a *genuine* issue of material fact cannot be conjured out of nothing. We adopted the sham-affidavit rule "to weed out unfounded claims, specious denials, and sham defenses." *Babrocky*, 773 F.2d at 861.

By incorporating by reference the assertions from his amended complaint, James's affidavit contradicted his deposition testimony in numerous respects. A few of the contradictions include:

- Paragraph 17 of the amended complaint alleges that James was "never seen by any medical staff" "for a week" spanning from approximately January 20 to 28, and paragraph 22 alleges that he thereafter "received no medical attention to the problems at hand or was even seen by medical staff." In his deposition James acknowledged that he saw nurses in the jail infirmary "daily"; he "had the opportunity" to speak to them; and he was "seen by an outside physician, whether it be at the ER or by a specialist, a total of five times between January 11th and February 24th."

- Paragraphs 32 to 34 of the amended complaint describe an interaction between Hale and James "on or around the date of *February 20*" in which he complained of facial pain and swelling. According to James's deposition testimony and the medical rec-

ords, this event actually took place on *February 19*.
This is a crucial interaction, and by the time of the
summary-judgment motion, James and his attorney
knew the actual date. There is no basis to accept an af-
fidavit swearing to an important transactional date
that James and his attorney knew was wrong.

- Paragraphs 51 to 56 describe a series of events span-
  ning from February 25 to March 1 that, according to
  James's testimony, could not have happened on the
  specified dates. The amended complaint asserts that
  James contacted his criminal attorney from jail on
  February 25 asking for his help in getting released so
  he could seek medical attention. The amended com-
  plaint also asserts that James visited with his attorney
  from the jail via videoconference on February 27 and
  was released from custody on March 1. None of this is
  true: James was released from custody on
  February 24, as he acknowledged in his deposition.

These contradictions do not concern minor details. The
gravamen of James's constitutional claim is that Hale's
response to his medical needs was objectively unreasonable.
The claim entails a context-sensitive, fact-bound inquiry into
the intentionality of the defendant's conduct *and* the totality
of the circumstances. *See McCann v. Ogle County*, 909 F.3d
881, 886 (7th Cir. 2018). The contradictory dates matter
because the timing of the events is central to James's conten-
tion that Hale failed to adequately address his medical
needs. *When* James requested to see Hale and *whether* he was
seen by medical professionals over a particular period
between his injury in late January through his release from

the jail in late February 2015 are factual issues that would be focal points in any subsequent trial.

James responds that the judge relied on contradictions between his reach-back affidavit and the contents of records from the infirmary and outside medical providers. He insists that this cannot establish any contradiction between sworn statements made *by him*. He also notes that we have in several cases said that the sham-affidavit rule is narrow and should be applied with caution. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015) (cautioning that the sham-affidavit rule "must be applied with great care … because summary judgment is not a tool for deciding questions of credibility").

It's true that the sham-affidavit rule applies to contradictions between an assertion in a party's summary-judgment affidavit and the party's prior sworn testimony. But this does not help James's position. The contradictions between James's reach-back affidavit and his deposition testimony fall squarely within the core of the sham-affidavit rule.

For the sake of completeness, it's worth noting that we have recognized three exceptions to the sham-affidavit rule. An affidavit that contradicts prior testimony but contains newly discovered evidence is allowed. *Adelman-Tremblay v. Jewel Cos., Inc.*, 859 F.2d 517, 520 (7th Cir. 1988). And because a deponent may be confused by a question and his memory may fail, a judge may also consider an affidavit that contradicts a statement in a deposition if the statement is demonstrably mistaken. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). We also allow the submission of a supplemental affidavit that clarifies ambiguous or confusing

deposition testimony. *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1171–72 (7th Cir. 1996).

None of these exceptions applies here. James's reach-back affidavit did not clarify ambiguous or confusing deposition testimony, *see Buckner*, 75 F.3d at 292, and he hasn't demonstrated that the relevant deposition statements were mistaken, *see Russell*, 51 F.3d at 67–68. His affidavit contains no newly discovered evidence—to the contrary, it fails to acknowledge the known, newly discovered evidence. *See Adelman-Tremblay*, 859 F.2d at 520. James's affidavit was properly excluded as a sham.

The affidavit from his mother is another matter. Patricia Powell did not testify in deposition or make any other sworn statements about these events before swearing out her affidavit incorporating the complaint's allegations about her phone call to Hale. But any error in excluding her affidavit was harmless. The factual assertions that Powell incorporated by cross-reference add nothing of importance to James's case. The amended complaint alleges only that she contacted Hale in January 2015 regarding James's medical care and that Hale "assured [her] the situation would be taken care of."

The lack of detail here vitiates any evidentiary value. If the call had taken place, say, on January 29 after James had been seen by nursing staff and by specialists, *and* if Powell had told Hale that James's condition had considerably worsened, *and* if Hale had *then* declined to act, that *might* give Powell's conversation with Hale some substance. But as it stands the assertion does not support a reasonable inference that Hale's conduct was objectively unreasonable.

Although Powell's affidavit should not have been excluded, it does not change anything.

## C. Merits

A § 1983 claim that a state pretrial detainee has received inadequate medical care is predicated on the rights secured by the Fourteenth Amendment's Due Process Clause. *Miranda v. County of Lake*, 900 F.3d 335, 346–47 (7th Cir. 2018). Claims of inadequate medical care while in pretrial detention are subject to an objective-reasonableness standard. *Id.* at 352. Hale was employed by a private company that contracted with St. Clair County to provide medical care, so she was a state actor amenable to suit under § 1983. *Id.* at 346–47.

The plaintiff bears the burden to demonstrate objective unreasonableness, and he must make a twofold showing. First, he must show that the defendant acted purposefully, knowingly, or recklessly when considering the consequences of his response to the medical condition at issue in the case. *McCann*, 909 F.3d at 886. Second, the plaintiff must show that the challenged conduct was objectively unreasonable in light of the totality of the relevant facts and circumstances. *Id.* James has not presented sufficient evidence for a reasonable jury to find in his favor on either element of the claim.

To the extent that James contends that Hale's actions were objectively unreasonable because she did not provide additional pain medication, our decision in *McCann* is instructive. There we held that a nurse who administered medicine in accordance with a doctor's prescription but failed to take the detainee's vital signs did not act purposefully, knowingly, or recklessly. *Id.* So too here: doctors

prescribed medication on three occasions during the relevant time period. Overnight on January 11–12 James received morphine for pain in the emergency room and a ten-day prescription for Motrin when he returned to the jail infirmary. On January 25 the Motrin prescription was extended for another ten days. And on the morning of February 23, Dr. Kraemer's office called the jail infirmary and recommended Cipro. In each case James received the prescribed medication without significant incident.

Dr. Angarone, James's expert, offered his opinion that James "developed an abscess on the left side of his face at the site of his left zygomatic fracture *due to negligence* by the [d]efendant by not obtaining [a] timely evaluation for the [p]laintiff by a physician and [not] dealing the administration of antibacterials prescribed by Dr. Kraemer on Feb[ruary] 20, 2015." (Emphasis added.) But more than negligence or even gross negligence is required for a viable § 1983 claim for inadequate medical care. *Id.* at 887.

James argues that it was objectively unreasonable for Hale not to send him to the emergency room on February 19. However, James saw Dr. Kraemer the very next day, and the doctor did not find his condition severe enough to require an emergency-room trip. Dr. Kraemer ordered a CT scan and recommended that James be given Cipro and return for a follow-up visit in two weeks. James contends that Hale unreasonably delayed his receipt of the antibiotic, but the record shows otherwise. No evidence suggests that Hale was aware of Dr. Kraemer's recommendation before the morning of February 23. And she immediately contacted a doctor to fill the prescription. James received his first Cipro dose that evening during the next scheduled medication pass.

*   *   *

Because a reasonable jury could not find for James on his constitutional claim against Hale, summary judgment in her favor was appropriate.

AFFIRMED