In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-1821

JEBARI CRAIG,

*Plaintiff-Appellant,*

*v.*

WROUGHT WASHER MANUFACTURING, INC.,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:19-cv-01786 — **Brett H. Ludwig**, *Judge.*

———————————

ARGUED JANUARY 18, 2024 — DECIDED JULY 16, 2024

———————————

Before RIPPLE, BRENNAN, and SCUDDER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Jebari Craig worked for Wrought
Washer Manufacturing, Inc. ("Wrought") from December
2010 until his termination in April 2019. He brought this Title
VII action alleging that Wrought retaliated against him for fil-
ing a racial discrimination grievance. The complaint identi-
fied three instances of retaliation, but this appeal concerns
only one of those claims: that he was unlawfully terminated
in retaliation for filing his racial discrimination grievance. The

district court granted summary judgment to Wrought on that claim. In doing so, the court relied on a contradictory declaration submitted by Wrought, the moving party, but did not consider a declaration submitted by Mr. Craig. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

Mr. Craig, who is black, worked at Wrought, a producer of washers, nuts, and bolts, from 2010 until his termination in 2019. He began his employment in the general labor pool but eventually worked his way up to a job in stamping. Throughout Mr. Craig's employment with Wrought, Paul Schaefer was the plant manager.

Mr. Craig became the union president in 2018. In this role, he negotiated the union's contract with Wrought. During contract negotiations in 2018, Mr. Craig expressed his concerns to Schaefer about what he viewed as Wrought's lack of minority leadership. Earlier, in 2017, he had expressed his concerns about racial discrimination at Wrought to Schaefer.

On November 28, 2018, Mr. Craig got into a disagreement with a lead employee and a supervisor. This disagreement became a "yelling match" and worked its way up the shop floor and eventually to the front near Schaefer's office.[1] After Schaefer and a union employee informed Mr. Craig that he was in the wrong, Mr. Craig went back to the shop floor and

---

[1] R.27 ¶ 27.

began writing a union grievance. Later that same day, Mr. Craig handed Schaefer a grievance alleging racial discrimination based on Schaefer's lack of response to Mr. Craig's concerns about racial disparities at Wrought. Handing this grievance to Schaefer constituted the first step of the union's grievance process.

On December 3, Schaefer gave Mr. Craig a written warning for being loud and disruptive during the November 28 incident. Although Schaefer stated that Mr. Craig was "consistently loud, disruptive," and that "[t]hat was the way he operated," Mr. Craig had received no earlier discipline for his behavior.[2] Schaefer told Mr. Craig that Wrought "can't have this kind of behavior" and that he needed "to get something on file" about the incident.[3]

Schaefer and Mr. Craig met in early January 2019 to discuss Mr. Craig's allegations about the lack of minority leadership at Wrought. During the meeting, Mr. Craig expressed his concern that, compared to white employees, black employees at Wrought received fewer training opportunities, had less upward mobility, held inferior positions, and were subjected to racial disparities in discipline. Wrought investigated Mr. Craig's allegations in the weeks after the meeting and determined that Mr. Craig's claims lacked merit. Schaefer emailed Mr. Craig the investigation report's results.

Events at Wrought escalated further in early-to-mid-March. On March 7, Mr. Craig's work supervisor, Jason Jacobs, caught him using his cell phone while running his

---

[2] R.24-1 at 29.

[3] R.22-1 at 52.

stamping machine. Wrought had a policy against its employees using cell phones while on the shop floor, and so Jacobs verbally warned Mr. Craig to put away his phone. A few days later, on March 11, Mr. Craig informed Schaefer that the union was formally requesting to move forward in the grievance process. The next day, Jacobs saw Mr. Craig using his cell phone three more times on the shop floor. The third time, he reprimanded Mr. Craig. A terse exchange between the two followed. Jacobs emailed Schaefer a report of the incident. In the email, he reported that Mr. Craig had told him what he was doing was none of his "[expletive deleted] business."[4]

The following day, Schaefer and Wrought's human resources manager met with Mr. Craig to discuss his confrontation with Jacobs. After hearing Mr. Craig's version of the story, Schaefer credited Jacobs's version and suspended Mr. Craig without pay, pending the results of an investigation into whether Mr. Craig had violated any of Wrought's policies. The investigation lasted fourteen working days. Partway into the investigation, on March 26, Mr. Craig emailed Schaefer's supervisor and raised his concern that the length of his suspension was in retaliation for his discrimination grievance. He pointed out that the investigations into two white employees who were suspended for insubordination each lasted only one day.

On April 5, Schaefer called Mr. Craig to discuss his return to work. Schaefer informed Mr. Craig he could return to work if he signed Wrought's "Last Chance Agreement." By its terms, the Last Chance Agreement permitted Mr. Craig to return to work if he agreed to abide by Wrought's company

---

[4] R.19-1.

policies. Mr. Craig refused to sign the agreement, and Wrought subsequently terminated him.

After his termination, Wrought offered Mr. Craig a severance agreement. But the severance agreement required Mr. Craig to release his discrimination claims against Wrought, and therefore he refused to sign it.

**B.**

Mr. Craig brought this action against Wrought in the United States District Court for the Eastern District of Wisconsin. His complaint set forth allegations that Wrought had violated Title VII of the Civil Rights Act of 1964 by retaliating against him for filing a grievance. He identified three instances of alleged retaliation: (1) his December written warning; (2) his March suspension; and (3) his April termination.

After the parties conducted discovery, Wrought moved for summary judgment, which the district court granted in part and denied in part. First, as to the written warning, the court concluded that Mr. Craig had failed to establish his prima facie case of retaliation because the warning did not constitute an adverse employment action. Second, the court reasoned that Mr. Craig's claim regarding his March suspension should move forward to trial based on the suspicious timing and length of the suspension.[5] Third, and of prime importance to this appeal, the district court granted summary judgment to Wrought on Mr. Craig's claim regarding his April termination. Mr. Craig now appeals the judgment of the

_____

[5] The parties later filed a joint motion to dismiss this claim, which the district court granted.

district court as to his retaliation claim based on his termination.

## II

## DISCUSSION

We review the district court's summary judgment ruling de novo, construing the record in the light most favorable to Mr. Craig. *See James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020). To succeed on his Title VII claim relating to his termination, Mr. Craig must show that he engaged in protected activity, that he suffered an adverse employment action, and that a causal connection exists between the two. *See King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017). Only the third element is in dispute, and whether Mr. Craig has satisfied that disputed element turns on the contents of his April 5 telephone conversation with Schaefer.

### A.

In order to evaluate properly Mr. Craig's argument on appeal, we first must examine in some detail the facts surrounding the April 5 telephone conversation between Schaefer and Mr. Craig. In that conversation, Schaefer offered Mr. Craig the opportunity to return to work if he signed the Last Chance Agreement. Mr. Craig refused to sign the agreement, and the parties dispute the reason for his refusal. Wrought submits that Mr. Craig refused to sign because the Last Chance Agreement did not provide him with back pay for the fourteen days of work he missed while on suspension; Mr. Craig contends he refused to sign because Schaefer told him that the Last Chance Agreement required him to give up his discrimination claims against Wrought. Because the district court agreed with Mr. Craig that Wrought could not lawfully condition his

continued employment on the sacrifice of his discrimination claims, Mr. Craig's termination claim hinged on the substance of this phone conversation.

Prior to and at the beginning of this litigation, Mr. Craig maintained that he refused to sign the Last Chance Agreement because it did not provide for back pay for his fourteen-day suspension. He had testified in an unemployment hearing before an administrative law judge that he refused to sign the agreement because it did not provide for back pay.[6] His complaint stated that he refused to sign the Last Chance Agreement because it did not provide for back pay.[7] And he testified in his deposition that he refused to sign the agreement because it did not provide for back pay.[8]

But Mr. Craig's story changed after Schaefer's deposition. During that deposition, Schaefer stated that the Last Chance Agreement "was a full and final settlement" that required

---

[6] R.32-1 at 3 ("When I was offered [the Last Chance Agreement], I didn't – I couldn't even accept them because they wasn't willing to work with me on getting me my backpay because they had me suspended for 15 days before I even met with somebody after the initial meeting, and that's not protocol at all.").

[7] R.1 ¶ 5 ("The company offered … Craig a last chance agreement. The agreement required Craig to accept fourteen days without pay. Craig made a counteroffer that would have required the company to pay for the days Craig had been suspended. The company rejected the counteroffer and fired Craig on April 11, 2019."); *id.* ¶ 22 ("While Craig was offered a last chance agreement, the agreement required him to accept fourteen days without pay.").

[8] R.22-1 at 82 ("I told them if – I would agree to sign [the Last Chance Agreement] if they compensated me for my 14 days that I had missed. … I didn't say 'no' to their agreement. I said, 'I will sign the agreement if y'all pay me my backpay for my 14 days I missed.'").

Mr. Craig to relinquish his right to pursue his discrimination and retaliation claims.[9] But Schaefer also appeared to be confused about the difference between the Last Chance Agreement and the severance agreement; at one point he stated that he was unfamiliar with the severance agreement offered to Mr. Craig.[10] The parties took a break, hoping to clear up some of the confusion, but when the deposition resumed Schaefer continued to testify that the Last Chance Agreement required Mr. Craig to give up his discrimination claims.

After the deposition, Mr. Craig and Schaefer both filed declarations. Mr. Craig's declaration stated that the reason he refused to sign the Last Chance Agreement was because the agreement required him to release his discrimination claims

---

[9] R.24-1 at 34. Later, when pressed by Mr. Craig's counsel, Schaefer acknowledged that the Last Chance Agreement did not contain such terms but maintained that he had told Mr. Craig the agreement was a full and final settlement:

| COUNSEL: | Now, earlier you had testified about something saying this is a full and final agreement. Do you recall that testimony? |
|---|---|
| SCHAEFER: | Yes. |
| COUNSEL: | Do you see that language in [the Last Chance Agreement]? |
| SCHAEFER: | I do not see those words in this document, no. |
| COUNSEL: | But those were words that you used in the telephone conversation with Mr. Craig? |
| SCHAEFER: | They were, that's correct. |

*Id.* at 35.

[10] *Id.* at 31 ("Yeah, yeah, I have not seen [the severance agreement] before.").

against Wrought.[11] Schaefer's declaration, on the other hand, sought to modify his deposition testimony. Schaefer stated that during his deposition, he confused the Last Chance Agreement with the severance agreement, and that he did not recall that the severance agreement was a separate document until it was shown to him during his deposition.[12] He clarified that the severance agreement required Mr. Craig to release his claims against Wrought but that the Last Chance Agreement did not.[13] He stated that he did not tell Mr. Craig that the Last Chance Agreement had such a requirement.

---

[11] R.23 ¶ 15 ("On April 5, 2019 Schaefer offered me a [Last Chance Agreement]. During the conversation about the agreement, I told Schaefer that I wanted to return to work but I was still going to pursue the race discrimination grievance. I also told Schaefer that I had met with the U.S. Equal Employment Opportunity Commission ('EEOC') and that I was going to pursue discrimination and retaliation claims there as well. Schaefer told me that I could not return to work if [I] continued to pursue any claims against Wrought Washer. I told Schaefer that I would not give up my right to do so. Schaefer told me I was fired.").

[12] R.31 ¶ 6 ("The severance agreement offered to Craig was a separate document, which was offered to Craig after I terminated him. I did not recall that at deposition, and confused the severance agreement with the 'Last Chance Agreement.' I am not a lawyer, and these events are years-old at this point. I simply did not recall the two separate documents, which is why I did not even recall the separate severance agreement until it was shown to me at deposition.").

[13] *Id.* ¶ 8 ("In retrospect, I was confused between the 'Last Chance Agreement' and the severance agreement. I and the union representative confirmed Craig had to release claims as part of full and final settlement per the offered severance agreement, not his 'Last Chance Agreement.' As the 'Last Chance Agreement' contains no such release, and is not a condition of returning to work, neither I nor the union representative said that about ( … continued)

In deciding Wrought's motion for summary judgment as to Mr. Craig's termination claim, the district court considered the chain of events we have just described. It then credited Schaefer's declaration testimony stating that the Last Chance Agreement had not required Mr. Craig to give up his discrimination claims. The court decided that Schaefer's contrary deposition testimony had been the product of confusion and that Mr. Craig's conduct throughout the litigation—most notably not mentioning any requirement that the Last Chance Agreement required him to give up his claims until after Schaefer had mistakenly testified that it did—supported its conclusion. The district court did not address specifically Mr. Craig's declaration but noted that "[n]o reasonable litigant would have withheld this dispositive information." *Craig v. Wrought Washer Mfg., Inc.*, No. 19-cv-01786, at *9 (E.D. Wisc. Mar. 4, 2022).

To resolve Mr. Craig's claim on appeal, we must decide whether the district court treated appropriately the post-deposition declarations submitted by Schaefer and Mr. Craig.[14] Although we typically review evidentiary rulings, such as the district court's decision to strike an affidavit or declaration, for abuse of discretion, *see Buckner v. Sam's Club*, 75 F.3d 290,

---

the 'Last Chance Agreement.' The severance agreement contains such a release.").

[14] Declarations are similar to affidavits but not sworn to "in the presence of someone authorized to administer oaths." *Owens v. Hinsley*, 635 F.3d 950, 954 (7th Cir. 2011). However, an unsworn declaration that satisfies the requirements of 28 U.S.C. § 1746 "is equivalent to an affidavit for purposes of summary judgment." *Id.* at 955 (collecting cases). The parties raise no issues before us about the form of the declarations.

292 (7th Cir. 1996),[15] in the sham affidavit context, once the district court permits an affidavit or declaration, we often review de novo its decision as to whether that affidavit or declaration presents a genuine dispute of material fact precluding summary judgment, *see Com. Underwriters Ins. Co. v. Aires Env't Servs., Ltd.*, 259 F.3d 792, 799 (7th Cir. 2001).[16]

Mr. Craig submits that the district court should have applied the so-called "sham affidavit rule" and rejected Schaefer's post-deposition declaration. In that declaration, Schaefer maintained that, throughout his deposition (both before and after the break), he was confused about the respective conditions imposed by the Last Chance Agreement and the severance agreement. Mr. Craig, however, contends that Schaefer was not confused during his deposition. He argues that the sham affidavit rule applies to bar Schaefer's later declaration and, therefore, that Schaefer's original deposition testimony should control.

---

[15] *See also Clemons v. Wexford Health Sources, Inc.*, No. 23-1790, 2024 WL 3262726, at \*3 (7th Cir. July 2, 2024); *Dunn v. Menard, Inc.*, 880 F.3d 899, 912 (7th Cir. 2018); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 406 n.5 (7th Cir. 2008); *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1055–56 (7th Cir. 2000); *Maldonado v. U.S. Bank*, 186 F.3d 759, 768 (7th Cir. 1999).

[16] *See also James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020); *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907–08 (7th Cir. 2016); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995); *Adelman-Tremblay v. Jewel Cos., Inc.*, 859 F.2d 517, 521 (7th Cir. 1988); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 862 (7th Cir. 1985).

Our colleagues in the District of Columbia Circuit have noted that application of the sham affidavit rule is sometimes subject to de novo review and sometimes reviewed for abuse of discretion. *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 n.\* (D.C. Cir. 2007) (collecting cases).

Contradictory post-deposition declarations usually come before the district court when, faced with a summary judgment motion, the *nonmoving* party seeks to create a genuine issue of triable fact in order to resist successfully that motion. In short, the party resisting the summary judgment motion tenders a declaration functionally amending a deposition. *See Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). Courts understandably have assessed such a maneuver with a skeptical eye. The sham affidavit rule, as its name indicates, "permits a judge to disregard a 'sham' affidavit—typically an affidavit that contradicts prior deposition testimony." *James*, 959 F.3d at 315. The rule prevents a nonmoving party from creating an issue of fact by submitting a contradictory affidavit. *Dunn v. Menard*, 880 F.3d 899, 910 (7th Cir. 2018). We have recognized, nevertheless, three exceptions to this rule. *James*, 959 F.3d at 317. We permit the consideration of a contradictory post-deposition declaration when (1) the affidavit contains newly discovered evidence; (2) the original statement was demonstrably mistaken; or (3) the affidavit clarifies ambiguous or confusing deposition testimony. *Id.* If an affidavit falls into any of those three categories, it may be considered. *Id.*

This case does not present the usual situation. Here, Schaefer's declaration was filed by the *moving* party rather than the nonmoving party. The United States District Court for the Northern District of Illinois noted the significance of that difference recently:

> It is unlikely that the sham affidavit rule can be invoked against the *moving* party. … The sham affidavit rule ensures that "a *genuine* issue of material fact cannot be conjured [by the non-

> movant] out of nothing." *James*, 959 F.3d at 316.
> But when a movant submits contradictory evi-
> dence, summary judgment is denied in the or-
> dinary course based on the fact dispute inherent
> in that evidence, without resort to the sham af-
> fidavit rule.

*Ludwig v. United States*, 512 F. Supp. 3d 874, 878 (N.D. Ill. 2021)
(alteration in original). In *Ludwig*, the court recognized that
the Sixth Circuit had held that the sham affidavit rule plays
no effective role where the *moving* party files an allegedly con-
tradictory affidavit with his or her motion for summary judg-
ment. *Id.* (citing *Reed v. City of Memphis*, 735 F. App'x 192, 198
(6th Cir. 2018)).[17]

When confronted by a declaration tendered by the moving
party, we have refrained from taking a rigid approach and
have encouraged district courts to consider the totality of the
circumstances in evaluating the declaration of a moving
party. This cautious approach on our part simply recognizes
that the integrity of the deposition process requires, on occa-
sion, consideration of the filed declaration without the denial
of the underlying summary judgment motion. *See Com. Un-
derwriters*, 259 F.3d at 799 (affirming grant of summary judg-
ment and crediting moving party's contradictory affidavit be-
cause deponent had been confused); *Maldonado v. U.S. Bank*,
186 F.3d 759, 769 (7th Cir. 1999) (concluding no abuse of dis-
cretion for district court to deny motion to strike moving
party's supplemental affidavit and affirming grant of

---

[17] This case is an unpublished disposition of the Sixth Circuit, and we
therefore consider it only as legal commentary and not case law worthy of
more deference.

summary judgment). Our refusal to implement a categorical rule that all declarations of a moving party must result always in the denial of the underlying summary judgment motion hardly signals that courts should accept such declarations uncritically. To avoid abuse of the summary judgment process, permitting such a declaration on the part of the moving party, without the consequence of denying the pending summary judgment motion, must be a practice utilized only when the district court is convinced that the circumstances surrounding the deposition make it clear that consideration of the declaration is required to achieve clarity and accuracy. Here, the district court carefully assessed Schaefer's claim of confusion. It then wrote:

> Schaefer's deposition testimony was demonstrably the product of confusion. He accurately described the provisions of the "Severance Agreement" but misattributed them to the "Last Chance Agreement." It is hardly extraordinary that someone with no background in contract law would mistake the former for the latter, especially considering that the two documents were issued only weeks apart, over a year prior to the deposition.

> That Schaefer's testimony was mistaken is supported by Craig's conduct of this litigation. Had Schaefer actually offered this blatantly unlawful ultimatum, Craig might have thought that worthy of inclusion in his complaint, testimony before the administrative law judge, or deposition transcript. Yet in all three, Craig testified only that he refused to sign the "Last Chance

> Agreement" because it required him to forfeit 14 days of backpay. It was only after Schaefer's deposition that Craig advantageously "recalled" that the "Last Chance Agreement"—in addition to the "Severance Agreement"—required him to release his race discrimination claims. No reasonable litigant would have withheld this dispositive information pending his adversary's unprompted confession.

*Craig*, No. 19-cv-01786, at *9 (internal citations omitted).

The district court acted prudently. Schaefer was demonstrably confused during his deposition, and his later declaration does not preclude a grant of summary judgment to Wrought. The district court committed no error in its consideration of his declaration.

**B.**

We now consider Mr. Craig's declaration. The district court did not believe that this declaration presented a genuine issue of material fact which precluded summary judgment. It reasoned that, if events had occurred as set forth in Mr. Craig's declaration, he would not have waited until after Schaefer's deposition to provide this information to the district court. We agree. As the district court explained, Mr. Craig testified at three different points in time that he refused to sign the Last Chance Agreement because it did not provide for back pay. He was adamant that he "would agree to sign it if they compensated me for my 14 days that I had missed."[18] And he never mentioned that the Last Chance Agreement

---

[18] R.22-1 at 82.

required him to relinquish his claims until after Schaefer's deposition, when he "advantageously 'recalled,'" *Craig*, No. 19-cv-01786, at *9, such a requirement. Put another way, when viewing the record as a whole, a rational trier of fact could not find for Mr. Craig on this issue. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also Kelley v. Stevanovich*, 40 F.4th 779, 787 (7th Cir. 2022) (affirming district court's decision to assign little weight to "weak affidavit").

## Conclusion

The judgment of the district court is affirmed.

AFFIRMED