In the
# United States Court of Appeals
## For the Seventh Circuit

No. 21-1853

ASHAKI PASCHALL and GERALD RAGLAND,

*Plaintiffs-Appellants*,

*v.*

TUBE PROCESSING CORPORATION,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 19-cv-4488 — **Jane Magnus-Stinson**, *Judge*.

ARGUED DECEMBER 10, 2021 — DECIDED MARCH 15, 2022

Before EASTERBROOK, KANNE, and SCUDDER, *Circuit Judges*.

KANNE, *Circuit Judge*. Ashaki Paschall and Gerald Ragland worked as machine operators for Tube Processing Corporation. During their employment, they experienced what they believed to be instances of sexual and racial harassment. A year after their employment ended, Paschall and Ragland sued Tube Processing Corporation. Paschall alleged that she was subjected to a hostile work environment based on her sex and race, and Ragland alleged that he was subjected to a

hostile work environment based on his race. The district court granted summary judgment to Tube Processing Corporation because it concluded that Paschall and Ragland did not produce sufficient evidence from which a reasonable factfinder could conclude that they satisfied all the elements of their claims. We affirm.

## I. BACKGROUND

### A. Paschall

Tube Processing Corporation ("Tube Processing") hired Ashaki Paschall, a Black woman, through a temporary staffing agency to work as a machine operator in its end forming and bending department.[1] Tube Processing is a commercial and aerospace manufacturing company that operates its commercial tube processing facility ("CTP facility") in Indianapolis, Indiana. Paschall worked in the CTP facility's Madison Building from September 4, 2018, through October 29, 2018.

### 1. Paschall's Interactions with Benash

John Benash, a white man who worked as a machine operator in the end forming and bending department, began training Paschall within her first few days on the job. Shortly after training commenced, Paschall complained to Josh Combs, the first shift group leader in the end forming and bending department, that she could not work with Benash because he only wanted to talk about Mario Andretti[2] and cars.

---

[1] End forming is a type of process in which the ends of hollow tubes are shaped. The tubes are bent by machines during a process called bending.

[2] Mario Andretti is a former racing driver, said to be one of the most successful Americans in the history of motorsports.

Although Paschall found Benash's comments distracting, Benash continued to train her. But a few days later, Benash's comments turned obscene. Benash asked Paschall: "Do you get wet when you have sex?" and "How does it look[?]" Paschall took these comments to mean Benash was asking her if "black women get wet just like white women get wet." Understandably hysterical, Paschall immediately reported Benash's lewd comments to Combs. Combs assigned Paschall to a different job for the rest of the day.

The next day, Paschall was again assigned to work near Benash. However, he did not make any inappropriate comments to her on that occasion or any other, and Paschall only took offense to Benash's comments on one other occasion. One day, after she had quickly completed a job, she overheard Benash telling coworkers "ooh that n[**]ga be working fast." Although Benash was not directly speaking to her, Paschall believed he was speaking about her. She reported the incident to Combs.

Paschall eventually spoke about the incidents with Sidney Young, the Assistant Vice President of Human Resources for Tube Processing. Young informed Paschall that Benash was out of work for an injury and that she would "deal with that issue when [Benash] comes back." On September 20, 2018, Young wrote Benash up for having "altercations or disagreements with co-workers." He was told to keep his "comments relevant to work and work related topics," and to not use "profane or provocative language around coworkers." He was also informed that if he did not change his approach, "further disciplinary actions could result."

*2. Paschall's Interactions with Odom*

Benash was not the only person causing difficulties for Paschall at Tube Processing. Paschall also had troubling interactions with Barb Odom, a white woman who worked as a machine operator in the end forming and bending department. On one occasion, Odom told Paschall that she and her mom used to live in Decatur, Indiana, but moved after "they bussed you guys out there." Paschall understood that comment to mean that Odom left Decatur because the city integrated its schools.

On another occasion, Odom asked Paschall if she had ever had "chocolate covered n[**]ger toe." Not knowing what that term meant, Paschall excused herself and went into the bathroom to look it up on her phone. She learned that it is a slang term for Brazil nuts, and the term was coined "because slaves didn't have shoes, [so their] feet looked like corn because [they weren't] allowed to have shoes." Paschall "felt like [Odom] was trying to find a clever way of saying 'n[**]ger' in front of [her] and it upset [her]."

Paschall reported the incident to Combs, who then reported it to Steve Lang, the supervisor of the Madison Building, and to Young. On October 2, 2018, Young sent an email about the incident to Lang; Mike Gill, the Vice President and General Manager; and Tracy Gerth, the Vice President of Human Resources. The email reads, in part:

> Our issue is how to address [Odom's] repeat behavior given the fact that several senior employees including minorities have made it known she has said this before. … Evidently, we didn't impress on [Odom] the severity of using this word back in 2011 or she isn't able or willing to change her behavior.

> Our decision on how to address this is critical to set a preceden[t] for future events of this nature. One of the people I talked to yesterday went so far as to say that we might lose people and set future minorities up for same terms if we don't address it harsh enough. Each of the 3 were surprised that she was still using this term and wasn't showing any remorse or understanding of the sensitivity of using the N word.

> We are faced with either Final Warning with Suspension or termination. A transfer to another job at Shelby with the warning is possible to remove her from the environment at Madison. Please weigh in at your earliest convenience.

Lang responded by noting that since 2008, Odom had "10 write-ups for performance issues, 7 evaluation reschedules for efficiency issues, and 2 documented conversations," as well as "numerous complaints on how she talks to employees." Lang concluded his email by recommending Odom be terminated. Gerth responded that she was also leaning toward termination.

Young investigated Odom by speaking to several employees of Tube Processing. Eventually, Young placed Odom on a three-day suspension. Odom's formal write-up stated that she "must never use this word in the facility again in any context," and that she would suffer "[i]mmediate termination if [she] ever use[d] the N word in any context." Paschall never heard Odom use the N-word again after Odom was suspended.

Besides the incidents with Benash and Odom, Paschall also had more general complaints about racism affecting her work environment at Tube Processing. For example, she

claimed that she did not receive overtime after reporting harassment, and that employees wore confederate flag T-shirts and apparel with the slogan "Make America Great Again," which she believed was racist. However, she never complained to anyone about these issues.

Moreover, after complaining to Young about being uncomfortable working in the same department as Odom, Young offered to take Paschall to another department to meet the supervisor and to discuss a possible transfer. After the meeting, Paschall claimed that the supervisor, a white male, refused to shake her hand and "looked at [it] like it was a disease." Paschall felt like she was not wanted in the brazing department.

The next day, Paschall quit her job at Tube Processing. She never complained to management about any incidents of harassment besides the incidents with Benash and Odom.

*B. Ragland*

In 2016, Tube Processing hired Gerald Ragland, a Black man, through a temporary staffing agency. Eight months later, Ragland was hired directly as a permanent employee. In 2018, Ragland worked first shift as a machine operator in the end forming and bending department.

During his employment at Tube Processing, Ragland felt he was exposed to a racist work environment for several reasons. Ragland believed that white employees were treated better than Black employees. He stated that some employees referred to themselves as the "Good Old Boys Gang," but that he could not "pinpoint exactly if they w[ere] being raci[st] towards [him]." Ragland, however, never complained to management or human resources about these issues.

Ragland also believed that Black employees were required to do harder jobs than white employees. He often complained about this to others. For instance, he complained to Combs that Odom was doing easier jobs than him. He also complained to Combs, Lang, and Young about getting difficult jobs, and proactively asked for a new position in the event another employee ever retired. However, even though Tube Processing used a bid system to apply for new positions, he could not identify what position he wished to place a bid for, nor could he identify any employee that got a new position outside of the bidding process.

Moreover, Ragland was displeased with the rate at which he moved from temporary employee to permanent employee. He claimed that white employees got hired as permanent employees more quickly than he did. But he could not provide the names of any such employees or any other details pertaining to his claim.

Ragland also perceived that he was mistreated during certain interactions with other Tube Processing employees because of his race. On several occasions, Combs approached Ragland to ask him if he was wearing headphones, because employees had reported seeing Ragland with headphones under the hood of his sweatshirt. According to company policy, employees were not allowed to have headphones. Combs often found Ragland with headphones and informally reprimanded him for having them. Indeed, Combs caught numerous white and Black employees wearing headphones and informally reprimanded them.

Combs also reprimanded Ragland for wearing a hooded sweatshirt. Tube Processing prohibits employees from wearing hooded sweatshirts. Since he was the only employee who

wore one every day, he believed Tube Processing's prohibi-
tion on them was because of him. On a separate occasion,
Ragland claimed that Combs accused him of stealing. But
Ragland could not point to any evidence suggesting that the
accusation was based on race.

Ragland likewise had interactions with Benash that he
viewed as hostile. On one occasion, Ragland and Benash had
a confrontation. Ragland reported the incident to Young and
Lang. Ragland, however, was ultimately written up for mak-
ing threats to Benash to handle the issue outside of work.

Ragland also thought that employees were racist for wear-
ing confederate flag and "Make America Great Again" ap-
parel. In October of 2018, management identified one em-
ployee who wore a President Trump shirt in the bending de-
partment. That employee was asked not to wear the shirt
again. Management also discussed the atmosphere that was
created by different employees wearing confederate flag and
political attire, noting that this type of attire was creating ani-
mosity among several employees. In response, Gerth stated
that she would talk to Young about coming up with a plan to
address these issues.

During his time at Tube Processing, Ragland received var-
ious verbal warnings and disciplinary write-ups, for reasons
such as: using an electronic vapor cigarette, using inappropri-
ate language with coworkers, violating the attendance policy,
not properly following directions for work-related tasks, us-
ing his cell phone on company time, engaging in horseplay,
and threatening a coworker.

On November 21, 2018, Ragland submitted a resignation
letter indicating that his last day of work would be December

1, 2018. But on November 29, 2018, Tube Processing decided to end Ragland's employment and directed him to leave. On his way to clear out his toolbox, Ragland got into a verbal altercation with another Black employee.

*C. The Suit*

In November of 2019, Paschall and Ragland sued Tube Processing. Paschall alleged that she was subjected to a hostile work environment based on her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 to -17, and based on her race, in violation of Title VII and 42 U.S.C. § 1981. Ragland alleged that he was subjected to a hostile work environment based on his race, in violation of Title VII and § 1981.

Tube Processing moved for summary judgment on all claims. The district court granted summary judgment to Tube Processing because it determined that Paschall and Ragland had not produced sufficient evidence from which a reasonable factfinder could conclude that they satisfied all the elements of their claims that they were subjected to a hostile work environment or constructively discharged based on sex or race.[3]

Paschall and Ragland now appeal.

---

[3] Paschall and Ragland do not expressly challenge the district court's constructive discharge ruling. We therefore do not address that issue. *See Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) ("[T]he plaintiffs have waived … their arguments on appeal by not developing them in their opening brief .").

## II. ANALYSIS

We review the district court's order granting summary judgment *de novo*. *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 643 (7th Cir. 2020) (citing *Ga.-Pac. Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011)). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "We draw 'all justifiable inferences' in the favor of the nonmoving party." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### A. Paschall's Sexual Harassment Claim

"Hostile or abusive work environments are forms of sex discrimination actionable under Title VII of the Civil Rights Act of 1964." *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)). To establish a claim of hostile work environment based on sex, a plaintiff "must establish that 'she was (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability.'" *Id.* (quoting *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 606 (7th Cir. 2006)). "These elements are evaluated in light of the 'particular facts and circumstances' of the case." *Id.* (quoting *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 382 (7th Cir. 2002)).

Here, however, we do not decide whether a hostile work environment existed because the question of whether Tube Processing took prompt and effective remedial action is dispositive.

Whether there is a basis for employer liability depends on whether the harasser is the victim's supervisor or co-employee. *Parkins v. Civ. Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). "When a supervisor is the harasser, the employer is strictly liable for his or her conduct, subject to any affirmative defenses that may preclude its liability." *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (citing *Parkins*, 163 F.3d at 1032). There is no evidence in the record to suggest that Benash was Paschall's supervisor, and she does not argue that he was.

When a coworker is the harasser, however, "[t]he employer is liable … only when the employee shows that h[er] employer has 'been negligent either in discovering or remedying the harassment.'" *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000) (quoting *Parkins*, 163 F.3d at 1032). "An employer's legal duty in co-employee harassment cases will be discharged if it takes 'reasonable steps to discover and rectify acts of sexual harassment of its employees.'" *Parkins*, 163 F.3d at 1032 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir.1997)).

Tube Processing was not negligent in discovering or remedying the alleged harassment. After Benash made his lewd comments to Paschall, she immediately reported them to Combs. Combs then assigned Paschall to a different job for the rest of the day. *See Lapka*, 517 F.3d at 984 ("The emphasis is on the prevention of future harassment." (citing *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir.1996))). Paschall never reported Benash again for any sexual harassment, before or after Tube Processing reprimanded him.

Simply put, after Tube Processing "receive[d] notice that some probability of sexual harassment exist[ed] … [it] adequately respond[ed] to that information within a reasonable amount of time." *Erickson*, 469 F.3d at 606. No reasonable fact-finder could conclude that Tube Processing was negligent in preventing future harassment.

### B. *Paschall's and Ragland's Race Discrimination Claims*

"Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 786–87, 787 n.1 (1998)). "To prove a claim for hostile work environment based on race, an employee must show that: '(1) he [or she] was subject to unwelcome harassment; (2) the harassment was based on his [or her] race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability.'" *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895–96 (7th Cir. 2016) (quoting *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 634 (7th Cir. 2009)). Claims under Title VII and § 1981 are analyzed in the same manner, and therefore case law addressing one type of claim applies to both types. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).

Paschall and Ragland argue that they were subjected to a hostile work environment because of their race. Most of their allegations, however, fail to support a claim for a hostile work environment because they cannot show that the alleged harassment was based on their race.

"To support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose." *Yancick*, 653 F.3d at 544. "Although a connection between the harassment and the plaintiff's protected class need not be explicit, 'there must be *some* connection, for "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority."'" *Cole*, 838 F.3d at 896 (quoting *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014)). "Nevertheless, forms of harassment that might seem neutral in terms of race … can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Id.* (citing *Landrau–Romero v. Banco Popular de Puerto Rico*, 212 F.3d 607, 614 (1st Cir. 2000)).

Paschall and Ragland contend that they had to do harder jobs than white employees, were not allowed to bid for other jobs, were denied overtime or opportunities for bonuses, had to work as temporary employees longer than others did, and were generally treated more harshly than white employees. But they do not provide sufficient evidence to support these assertions. *Cf. Yancick*, 653 F.3d at 548 ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." (quoting *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006)). That is, the evidence shows that the above identified harassment was not connected to their race.

Moreover, Ragland does not provide sufficient evidence to support his contention that Combs reprimanded him based

on his race for wearing headphones, a hooded sweatshirt, or for stealing. According to Tube Processing policy, employees are not allowed to have headphones. Tube Processing policy also prohibits employees from wearing hooded sweatshirts. The undisputed facts show that Combs caught numerous white and Black employees wearing headphones and informally reprimanded them. Ragland also could not point to any evidence suggesting that he was accused of stealing because of his race. Furthermore, Ragland does not show that his altercation with Benash was connected to race. He simply does not show that the complained-of conduct had a racial character or purpose. *Id.* at 544.

Paschall and Ragland also assert that Benash's and Odom's use of the N-word created a hostile work environment.

In analyzing whether the use of racial epithets create a hostile work environment, our case law has distinguished between supervisors and coworkers. *See Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("[A] supervisor's use of the term impacts the work environment far more severely than use by co-equals."); *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 640 (7th Cir. 2019) (citations omitted) (stating that in analyzing the severity of the use of racial epithets, courts must "address the significance of the differences between supervisors and co-workers and between direct and indirect harassment that are important in hostile work environment cases").

Our case law has also, on occasion, been concerned with the number of times a racial epithet was used. For instance, we have held that "the one-time use of a racial epithet is not severe enough to trigger liability." *Nichols v. Mich. City Plant*

*Plan. Dept.*, 755 F.3d 594, 601 (7th Cir. 2014). But if an employee is "repeatedly subjected to hearing the word 'n[**]ger,'" that is enough to create a hostile work environment. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004).

There is, however, no spectrum when it comes to the use of a racial epithet in the workplace. *Cf. Cerros v. Steal Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (stating that "there is no 'magic number' of slurs that indicate a hostile work environment"). Put differently, we should not be concerned with the number of times a racial epithet is used. What matters is looking to the totality of the circumstances when determining whether the conduct is sufficiently severe or pervasive to be actionable.

For that reason, there may well be a situation in which the one-time use of the N-word can be found to be severe enough to warrant liability. This is because "the word 'n[**]ger' is pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). "No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African–Americans." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring).

But we do not resolve that issue today because Paschall's and Ragland's arguments fail for the same reasons Paschall's hostile work environment claim based on sex failed—because Tube Processing took prompt and effective remedial action.

Paschall has not demonstrated a basis for employer liability. Paschall acknowledges that she only complained to Tube

Processing management about Odom's use of the N-word and about Benash's behavior. Accordingly, Tube Processing reprimanded both Odom and Benash. Odom was suspended for three days and warned that if she ever used racially inappropriate language again, she would be terminated. Paschall never heard Odom use the N-word again after Odom was suspended. Benash was also reprimanded and warned to keep his comments to work-related topics and to not use profane or provocative language around coworkers or further disciplinary actions could result. Tube Processing's actions were reasonably likely to prevent future harassment. *See Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 995 (7th Cir. 2011) ("To avoid liability, the employer must respond in a manner reasonably likely to end the harassment.").

Ragland has also not demonstrated a basis for employer liability. He did not personally witness Odom's use of the N-word or any of Benash's conduct. To be actionable, the harassing conduct would have had to be directed at him, and it was not. *See Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004); *Yancick*, 653 F.3d at 545 ("[T]he more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace." (citing *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555–56 (7th Cir. 2007)).

Finally, Paschall and Ragland assert that confederate flag and political attire contributed to a hostile work environment. But, here, they also fail to demonstrate a basis for employer liability because they did not report these matters to Tube Processing management or human resources. *See Hrobowski*, 358 F.3d at 478 ("Generally, the law does not consider an

employer to be apprised of the harassment 'unless the employee makes a concerted effort to inform the employer that a problem exists.'" (quoting *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999))); *Yancick*, 653 F.3d at 549 ("An employer is not liable for co-employee racial harassment 'when a mechanism to report the harassment exists, but the victim fails to utilize it.'" (quoting *Durkin v. City of Chi.*, 341 F.3d 606, 612–13 (7th Cir. 2003))). The evidence also does not support that Tube Processing was negligent in discovering or rectifying this issue—that political attire was creating animosity among several of its employees. *See Parkins*, 163 F.3d at 1032 ("An employer's legal duty in co-employee harassment cases will be discharged if it takes 'reasonable steps to discover and rectify acts of … harassment of its employees.'" (quoting *Perry*, 126 F.3d at 1013)).

### III. CONCLUSION

For the reasons above, we AFFIRM.