**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 31, 2022[*]
Decided June 1, 2022

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 21-3012

| | |
|---|---|
| KASIDEY KEMP, <br> *Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 1:19-CV-07637 |
| KICKERT SCHOOL BUS LINES, INC., <br> *Defendant-Appellee*. | Edmond E. Chang, <br> *Judge*. |

**O R D E R**

Kasidey Kemp, a former employee with Kickert School Bus Lines, Inc., appeals the summary judgment against her claims that the company subjected her to a hostile work environment and retaliated against her in violation of Title VII of the Civil Rights Act of 1964. The district court found insufficient evidence from which a jury could infer that Kickert was liable for a hostile work environment or retaliation. We affirm.

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

Kemp had worked only two months as a school bus monitor for Kickert (a company that provides school transportation in Chicago's south suburbs and northwest Indiana) when she first complained to a manager about a coworker's conduct. As she recounted, Oscar Foster, a bus driver, had made unwanted physical contact with her one morning in the company's break room. She said that Foster, while standing behind her, pressed on her lower back as she bent over to fix her pant cuffs. Debbie Cipkar, the manager to whom Kemp complained, worked with Kickert's human resources department to investigate the incident. Within a few days, Kickert determined that Foster had violated its sexual-harassment policy by touching Kemp without her consent. Kickert issued Foster a written warning, suspended him for three days, and retrained him on Kickert's sexual-harassment policy.

Over the next five months, Kemp repeatedly complained about Foster to Cipkar and the human resources department. Kemp reported one episode, for example, in which Foster entered the "driver's room"—a space where drivers and bus monitors check in for their shifts and learn about the day's assigned routes—sat near her, and made eye contact. Kickert investigated the report but concluded, based on an interview with a witness to the encounter, that Foster was not aware of Kemp's presence and did not violate Kickert's policies. Cipkar suggested to Kemp that if she felt uncomfortable running into Foster in the driver's room, she could wait for her shift in the office of her husband, who also worked for Kickert. Kemp also reported that Foster at times hugged other women while "smiling and staring" at her, and he often showed up to work early and stayed in the driver's room when Kemp (whose shift started before his) was there. After one such complaint, Cipkar told Kemp she did "not know what to tell [her]." Even so, Kickert investigated each incident and—though it determined that Foster had not violated its sexual-harassment policy—warned Foster to "be more aware" and to "stay away from" Kemp. Kickert also assigned a manager to monitor the driver's room.

Kemp also reported instances in which she says she was harassed by another coworker, Jeffrey Williams. About a month after Kemp complained about the incident when Foster touched her, Williams approached her in the driver's room, tapped one of her arms, and then backed up slowly, hands raised, and said, "Oh, I'm sorry. I shouldn't have done that! You might file a sexual harassment case against me." Later that day during an encounter in the parking lot, Williams told Kemp that men are "predators" and that sexual-harassment laws "stop men from doing what comes naturally to them." Kickert could not corroborate the events, but it nonetheless retrained Williams on its sexual-harassment policy.

Kemp sued Kickert for subjecting her to a hostile work environment by failing to protect her from Foster, inadequately punishing Williams, and suggesting that she—rather than Foster—avoid the driver's room. *See* 42 U.S.C. § 2000e-2. In addition, Kemp asserted that Kickert retaliated against her for filing complaints when it advised her to wait for her bus routes in her husband's office—a proposal that, in her view, would prevent her from obtaining information she needed for her shift. *See id.* § 2000-e3. Kemp also asserted a state-law claim of intentional infliction of emotional distress.

The district court entered summary judgment for Kickert. Regarding her claim of a hostile work environment, the court explained that no reasonable jury could conclude (1) that Kickert was negligent in preventing future harassment by Foster or Williams (evidence reflected that Kickert acted quickly to correct the offending behavior by suspending Foster, warning him to stay away from her, stationing a manager in the driver's room, and retraining both men on the sexual-harassment policy); or (2) that Kickert was liable—strictly or otherwise—for any alleged misconduct by Cipkar, a supervisor. As for Kemp's retaliation claim, the court determined that she had not furnished evidence from which a jury could infer that the offer for Kemp to wait for her shift in her husband's office was an adverse action. Finally, the court declined to exercise supplemental jurisdiction over the state-law, emotional-distress claim.

On appeal, Kemp challenges the district court's factual findings in concluding that Kickert could not be liable for subjecting her to the hostile work environment created by Foster and Williams. In her view, the district court failed to recognize that the suspension Kickert gave Foster for touching her was toothless because it covered days when Foster would not have worked because of a school closure.

Kemp misapprehends the basis of the district court's ruling. When, as here, an employee is harassed by coworkers, the employer is not liable when it "takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (internal citation omitted). As the court explained, the record reflects that Kickert responded swiftly to Kemp's complaint of inappropriate touching when it investigated the event, found a breach of its harassment policy, retrained Foster on the policy, and issued him a written warning and three-day suspension. *See Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir. 2022) (employer acted swiftly and appropriately in response to a complaint that coworker used the n-word by investigating complaint and issuing three-day suspension and final warning). Even if there was a school closure on one of the days Foster was suspended, the court rightly disregarded this evidence as "irrelevant"

because of evidence that Foster still would have reported to work and been given other routes or responsibilities.

Kemp also asserts that the district court ignored the ineffectual nature of Kickert's warnings to Foster, given that he continued to appear in the driver's room while she was there and to leer at her while he hugged other women. But the district court did consider this evidence; the court simply found it insufficient in light of the evidence that Kickert acted quickly and repeatedly to prevent further harassment. Employers satisfy their obligation under Title VII when they take steps reasonably calculated to prevent future harassment, even if those steps fail to prevent all contact between the employees. *See Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). Here, as the district court noted, no reasonable jury could conclude that Kickert failed to take steps aimed at preventing Foster and Williams from harassing Kemp: the undisputed record shows that Kickert offered Kemp an alternative place to await her bus routes, warned Foster to "be more aware" and "stay away" from her, assigned a manager to be present in the driver's room, and retrained Williams on the company's sexual-harassment policy.

Kemp also generally challenges the district court's conclusion that Kickert could not be strictly liable for the misconduct of her supervisor, Cipkar. But employers are strictly liable for a supervisor's misconduct only if it results in a tangible employment action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760, 766 (1998). The district court rightly found no evidence that Cipkar's actions caused any such action. Even if Kemp were somehow inconvenienced by Cipkar's offer to wait for her bus routes in her husband's office to avoid seeing Foster in the driver's room, the record shows that it did not affect her job responsibilities and was not the sort of "significant change in employment status" that is the hallmark of a tangible employment action. *Id*. at 760–61.

Finally, regarding her retaliation claim, Kemp argues that the district court disregarded evidence that she suffered adverse treatment after complaining about her coworkers. Kemp highlights two of Cipkar's statements. Kemp points, first, to Cipkar's comment that she "did not know what to tell [Kemp]" about Foster—a remark that Kemp construes to mean that Kickert would not look into her complaints about Foster. But as the district court concluded, this is not the sort of "materially adverse" action that would dissuade a reasonable worker from making a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Kemp also points to Cipkar's offer that Kemp wait in her husband's office for her shift to start—a suggestion that would make it difficult for her to get the information she needed to start her shift.

But Kemp has not shown how this offer was a materially adverse action; it was merely a proposal, not a requirement that altered her job responsibilities. *See id.*

AFFIRMED