In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 23-1983

STANFORD CLACKS,

*Plaintiff-Appellant,*

*v.*

KWIK TRIP, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:21-cv-611-jdp — **James D. Peterson**, *Chief Judge.*

_____

ARGUED APRIL 15, 2024 — DECIDED JULY 24, 2024

_____

Before KIRSCH, PRYOR, and KOLAR, *Circuit Judges.*

KIRSCH, *Circuit Judge.* In 2018, Stanford Clacks, an African American man, began working as a truck driver for Kwik Trip, Inc. During his employment, he was racially harassed by fellow employees. While Clacks was on COVID-19 pandemic leave, Kwik Trip investigated his complaints and verified the harassment allegations. In response, Kwik Trip fired the offending employees. Kwik Trip then asked Clacks to return to his previous job, or alternatively, to accept a severance

package. Clacks refused both offers. Clacks then sued Kwik Trip under 42 U.S.C. § 1981, alleging that Kwik Trip (1) subjected him to a hostile work environment, (2) failed to promote him based on his race, and (3) retaliated against him. The district court granted summary judgment to Kwik Trip on all claims. In doing so, it applied the sham-affidavit rule to disregard an affidavit submitted by Clacks in his opposition to summary judgment. Clacks now appeals the grant of summary judgment as to his hostile work environment and retaliation claims. Because the district court properly applied the sham-affidavit rule, and because Clacks did not present sufficient evidence for either of his substantive claims, we affirm.

I

Although we ordinarily take the facts in the light most favorable to the party opposing summary judgment, as we discuss further below, the district court properly excluded portions of Stanford Clacks's affidavit under the sham-affidavit rule. Therefore, we do not take those facts as true on appeal.

Clacks began training as a semi-truck driver for Kwik Trip, Inc. in June 2018. As part of his training, Clacks shadowed a series of veteran drivers on delivery routes. Clacks completed the first stint of his training without incident, but problems arose between Clacks and his second trainer, Tom Roerkohl.

It is undisputed that Roerkohl racially harassed Clacks during his training. Roerkohl degraded Clacks with racial epithets, probed about the race of Clacks's wife, and touted his connections to white supremacists around Clacks. Clacks eventually reported Roerkohl to his supervisor, Sean Clements. Clacks described Roerkohl as an awful person to work

with and requested a different trainer, but he did not detail the racial undertones of Roerkohl's misconduct. In response to Clacks's request, Clements reassigned him to another veteran driver, Brett Nechkash. Clacks never again crossed paths with Roerkohl.

Problems began immediately between Nechkash and Clacks. Nechkash, like Roerkohl, degraded Clacks with racial epithets and otherwise threatened him. Again, Clacks complained to Clements, but this time he specified that the harassment was based on his race. And again, Clements reassigned Clacks to another trainer for one final day of training, which Clacks completed without issue.

After Clacks completed training and began working his route independently, he continued to sporadically encounter racial harassment on the job. For example, he would sometimes still see Nechkash at the start of his shift in Kwik Trip's distribution center, and Nechkash would make derogatory remarks. Further, at an employee meeting in 2019, Nechkash handed Clacks a note that said, "[Y]oure [sic] the only one here leave," which he believes referred to his race, as he was the only African American driver at the meeting. Clacks brought the note to the attention of some other supervisors, Jason Pitts and Jeremy Renner, though there is no evidence that he expressed to either of them his belief that the note was racially motivated. Renner was apologetic, and he told Clacks that it was probably just a distasteful joke that he should ignore. Clacks had problems with another coworker too: Laren Kruse, a shuttle driver who worked at the distribution center, would also refer to Clacks with racial epithets, though Clacks testified that he did not "have a huge issue" with Kruse. Ultimately, this conduct led Clacks to set up a meeting with

fellow drivers to address some of his issues at work. According to Clacks, this meeting went well, and his situation at Kwik Trip improved as a result.

In March 2020, Clacks went on voluntary pandemic leave. As the leave neared its end, Clacks sent an email to Kwik Trip's Human Resources department complaining of the racial harassment he suffered throughout his employment. A member of the department, Ashley Callaway, followed up with Clacks, leading to a phone call that included Callaway, Clacks, and a transportation director, Mike Krajewski. During this phone call, Clacks discussed the use of racial epithets by his colleagues and the crude note he received at the employee meeting. Shortly thereafter, Clacks sent a letter to Kwik Trip summarizing his complaints. This letter prompted Kwik Trip to hire a third-party investigator, Mindy Rowland, to verify Clacks's claims of racial discrimination. While the investigation was pending, Kwik Trip pushed back Clacks's original July 31 return date. Rowland completed the investigation in early August.

Rowland's investigation substantiated Clacks's claims against Roerkohl, Nechkash, and Kruse. Accordingly, Kwik Trip fired all three employees. Callaway and Krajewski then called Clacks to discuss his future at Kwik Trip. They offered Clacks the opportunity to return to his original position, but Clacks indicated that he was scared to do so, fearing retaliation from the discharged employees. The parties then discussed the possibility of Clacks returning to a different role, though Clacks testified that Kwik Trip ultimately did not provide him with additional information about these roles. Kwik Trip also offered Clacks a severance package, but he declined. Kwik Trip interpreted Clacks's fear of returning to work and

his rejection of a severance package as a resignation. Thereafter, Clacks did not return to Kwik Trip in any capacity.

Clacks sued Kwik Trip under 42 U.S.C. § 1981, alleging that (1) he was a victim of a hostile work environment; (2) Kwik Trip wrongly retaliated against him by ending his employment following his complaints; and (3) he was wrongfully passed up for promotion in favor of white drivers. Kwik Trip moved for summary judgment on all claims. In his response opposing summary judgment, Clacks submitted an affidavit that the district court deemed partially inadmissible under the sham-affidavit rule. The district court then granted summary judgment in full for Kwik Trip, and Clacks appealed.

## II

We first address Clacks's argument that the district court misapplied the sham-affidavit rule. As a preliminary matter, Kwik Trip argues that Clacks has waived his argument on appeal because he did not file a surreply to Kwik Trip's summary judgment reply, wherein the sham-affidavit issue was first raised. But "[w]e have previously held that, when local rules do not permit filing a surreply as of right, a party does not waive an argument for purposes of appeal by failing to seek leave from the district court to raise the argument in a surreply." *Bourgeois v. Watson*, 977 F.3d 620, 631 (7th Cir. 2020). Here, the district court's local rules did not allow for the filing of a surreply as a matter of right, instead requiring permission from the court that would only be granted in "rare, unusual situations." W.D. Wis. Judge-Specific Procedures for Judge Peterson, at 6. Therefore, Clacks has not waived his challenge to the district court's application of the sham-affidavit rule.

We review a district court's application of the sham-affidavit rule for an abuse of discretion, *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020), which means that "the district court's decision is to be overturned only if no reasonable person would agree with the trial court's ruling," *Griffin v. Foley*, 542 F.3d 209, 218 (7th Cir. 2008). The sham-affidavit rule "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony" so that a "*genuine* issue of material fact cannot be conjured out of nothing." *Hale*, 959 F.3d at 316 (emphasis in original) (quotation omitted). Though the rule should be applied with "great care," *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015), "even affidavits that are not directly contradictory may be excluded under th[e] rule," *Hickey v. Protective Life Corp.*, 988 F.3d 380, 389 (7th Cir. 2021). In particular, courts may disregard affidavits that add new factual details not previously disclosed in deposition testimony when those details seek to undo the effects of the prior testimony and manufacture a dispute to get past summary judgment. See *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 293 (7th Cir. 1996) (affirming application of sham-affidavit rule where the plaintiff, who fell after tripping over an object, described the object vaguely in her initial deposition, but then provided more detail in a subsequent affidavit that tied the object directly to the defendant's store).

Clacks first argues that the district court abused its discretion by not considering his affidavit as to his complaints about Roerkohl. We disagree. According to his affidavit, when Clacks reported Roerkohl's misconduct to Clements, he provided extensive details as to the racially motivated harassment he suffered. Yet, in his earlier deposition, Clacks testified that he only told Clements that Roerkohl was an awful trainer, and he conceded that he withheld additional details

of racial harassment. Clacks's affidavit therefore directly contradicted his earlier testimony on what he told Clements about Roerkohl, and the district court did not abuse its discretion in disregarding it.

Second, Clacks similarly argues that the district court should have considered his affidavit as to his complaints about Nechkash. Specifically, his affidavit described a prolonged grievance process, where he began complaining to Clements about Nechkash early on in his training, and where Clements essentially brushed aside his concerns and asked him to "put up" with Nechkash's abuse. But Clacks's earlier deposition testimony told a different story. There, he was asked whether he ever complained to Clements about Nechkash. In response, Clacks only testified that he complained to Clements in the last few days of his training and that Clements then reassigned him to a new trainer for one final day. And when asked whether Nechkash was in his "rearview mirror" once he reached out to Clements, Clacks responded affirmatively. Thus, even if not directly contradicting his deposition testimony, Clacks's affidavit, like the affidavit in *Buckner*, 75 F.3d at 293, added new, inconsistent details regarding his complaints about Nechkash that painted Kwik Trip as wholly negligent in handling and redressing his complaints. The district court reasonably perceived these inconsistencies as an attempt by Clacks to skirt summary judgment, particularly on his hostile work environment claim, and excluded the applicable portions of his affidavit. Here too, the district court did not abuse its discretion.

## III

We turn to the district court's summary judgment order, which we review de novo, construing the record (minus the

facts excluded under the sham-affidavit rule) in the light most favorable to Clacks and drawing all reasonable inferences in his favor. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.* On appeal, Clacks only challenges the district court's grant of summary judgment for Kwik Trip on his hostile work environment and retaliation claims.

## A

Clacks brought his hostile work environment claim under 42 U.S.C. § 1981. We analyze § 1981 discrimination claims in the same manner as claims brought under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). To survive summary judgment, Clacks needed to show a genuine dispute of fact on four elements: (1) his work environment was both objectively and subjectively offensive; (2) race must have been the cause of the harassment he suffered; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Id.* The district court found genuine disputes of material fact as to the first three elements but granted summary judgment to Kwik Trip on the fourth element, finding that no reasonable jury could attach employer liability to Kwik Trip. We agree.

An employer's liability for a hostile work environment claim depends on whether the harasser was the victim's supervisor or, as here, merely a co-employee. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022). When the harasser is a co-employee, the employer is liable "only when the employee shows that her employer has been negligent

either in discovering or remedying the harassment." *Id.* (cleaned up). Thus, the employer's legal duty in co-employee harassment cases is discharged "if it takes 'reasonable steps to discover and rectify acts of [racial] harassment of its employees.'" *Id.* (quotation omitted). Because we do not expect employers to be aware of every impropriety committed by every low-level employee, "notice or knowledge of the harassment is a prerequisite for liability." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998). And this notice must be specific. When an employee reports harassment to the employer, the employee must provide "enough information to make a reasonable employer think there was some probability that she was being sexually [or racially] harassed." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) (alteration in original) (quotation omitted).

Clacks cannot show that Kwik Trip is liable for a hostile work environment. With respect to each episode of harassment in the record, Kwik Trip either was never put on notice of racial harassment or, when it was on notice, promptly implemented an adequate remedy that discharged its legal duty. Beginning with Roerkohl, Clacks never specified that Roerkohl racially harassed him, instead only noting that Roerkohl was generally an awful coworker. Thus, while Kwik Trip was on notice of friction between the pair, it was not on notice that Roerkohl harassed Clacks based on his race. Cf. *id.* at 426–27 (noting that while the employer was on notice of friction between its employees based on the plaintiff's reports of work-related arguments, it was not on notice of more serious racial harassment). And even if Clacks's complaint about Roerkohl provided adequate notice of a hostile work environment, Kwik Trip discharged its legal duty by promptly reassigning Clacks to a new trainer. *Paschall*, 28 F.4th at 813

(concluding that the employer discharged its duty by reassigning the plaintiff to a job away from the harassing coworker); *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480–81 (7th Cir. 1996) (same).

Next, as to his training with Nechkash, Clacks put Kwik Trip on specific notice that Nechkash had consistently harassed him based on his race. However, as with Roerkohl, Kwik Trip discharged its legal duty by immediately removing Nechkash as Clacks's trainer and allowing Clacks to finish his training with another, unproblematic employee. While Clacks still saw Nechkash in passing at Kwik Trip's distribution center, he does not argue that these interactions contributed to a hostile work environment. Further, the law does not require Kwik Trip to eliminate all possible contact between the two employees. See *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 995 (7th Cir. 2011) (noting that an employer discharged its legal duty by creating physical separation and minimizing the time worked together between the plaintiff and her harasser).

As to the threatening note Clacks received from Nechkash at the employee meeting, Clacks did notify a supervisor. However, there is no evidence that Clacks indicated to his supervisor that he believed the note was racially motivated. Moreover, even assuming that the supervisor should have known that the note was racially motivated, a single ambiguous note does not put Kwik Trip on notice of an actionable hostile work environment, particularly when Kwik Trip adequately responded to Clacks's other complaints of harassment. See *Bombaci v. J. Cmty. Publ'g Grp., Inc.*, 482 F.3d 979, 985 n.2 (7th Cir. 2007) (noting that isolated incidents of vague harassment do not notify the employer because they do "not

come close to creating an actionable hostile work environment").

On a final note, the district court concluded that Clacks's harassment from Kruse was not severe or pervasive enough to sustain a hostile work environment claim. Clacks does not challenge this determination on appeal, so it is waived. See *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023). In any event, Clacks admitted in his deposition that he "didn't have a huge issue with [Kruse]." Thus, Clacks did not subjectively view Kruse's conduct as particularly abusive or hostile, which bars his hostile work environment claim based on that conduct. See *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004) (noting that a work environment cannot be hostile if it is not "perceive[d] to be so" by the victim) (quotation omitted). For these reasons, the district court properly granted summary judgment to Kwik Trip on Clacks's hostile work environment claim.

B

Clacks's retaliation claim fares no better. Clacks proceeds with his claim under the direct method of proof, wherein a plaintiff must prove three elements: (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Miller v. Polaris Labs., LLC*, 797 F.3d 486, 492 (7th Cir. 2015). "We consider the evidence as a whole and conduct a 'straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [materially adverse action]?'" *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (alteration in original) (quotation omitted). Clacks contends that Kwik Trip retaliated against

him by terminating him following his complaints to human resources. The district court disagreed, granting summary judgment to Kwik Trip based on the second element, and concluding that no reasonable jury could find that Clacks suffered an adverse employment action because Kwik Trip offered Clacks his previous job. On appeal, Clacks's sole argument is that a genuine dispute exists as to whether he refused an offer to return to work. We are not persuaded.

It is undisputed that after investigating Clacks's claims of harassment, Kwik Trip fired the offending employees— Roerkohl, Nechkash, and Kruse. It is also undisputed that Callaway called Clacks to discuss his return to work. While some details of the call are disputed, Clacks admits in his opening brief that he raised safety concerns to Callaway about returning to work. And in his deposition, Clacks was specifically asked whether he told Callaway that he did not "feel safe" after Kwik Trip "offered to let [him] come back." Rather than dispute Kwik Trip's offer and his statement to Callaway, Clacks suggested that Callaway misunderstood him. In his view, he was only referring to his fear pertaining to the investigation, though he did not clarify this distinction to Callaway. Clacks thus urges that he never expressly refused an offer to return to work and that he never received a "legitimate" return offer because Kwik Trip never provided him a new start date.

These arguments do not save Clacks's claim. A reasonable jury, on this record, could not find that Kwik Trip harbored a retaliatory motive against Clacks due to his complaints of racial harassment. See *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 678 (7th Cir. 2010) ("In determining the significance of any given act of retaliation, the test is objective but 'context

matters' and we look at the 'constellation of surrounding circumstances, expectations, and relationships ….'") (quotation omitted). The record suggests just the opposite. Kwik Trip consistently remedied Clacks's issues with his coworkers. Then, it initiated an investigation into his complaints, which culminated in the termination of the three harassing employees. And finally, Kwik Trip asked Clacks to return to work after the investigation and discharge of the employees. The fact that Clacks did not expressly refuse a return offer is irrelevant. Kwik Trip reasonably interpreted Clacks's fear of returning to work as a rejection of that offer. Cf. *id.* at 680 ("Fort–Rohr made efforts to have Chapin return to work, explained that Chapin's employment was not terminated, and expressed a desire to keep Chapin on as an employee. At that point, Chapin's decision not to return to work was his own …."). Further, a reasonable jury could not conclude that Kwik Trip did not offer Clacks his old job simply because it did not give him a specific return date. Kwik Trip had no need to suggest a return date after Clacks expressed a fear of returning to work. Simply, Clacks cannot meet his burden to show that Kwik Trip was motivated to retaliate against him due to his harassment complaints. The district court thus correctly granted summary judgment to Kwik Trip on the retaliation claim.

AFFIRMED