**Affirm and Opinion Filed August 18, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-01066-CV**

**GIOVANNI FILARDO, Appellant**
**V.**
**BAYLOR SCOTT AND WHITE HEALTH, Appellee**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-20-18611**

## MEMORANDUM OPINION

Before Chief Justice Burns, Justice Molberg, and Justice Reichek
Opinion by Chief Justice Burns

Giovani Filardo appeals a summary judgment disposing of his claims against his former employer Baylor Scott & White Health for discrimination, retaliation, and hostile work environment. We affirm.

### I. BACKGROUND[1]

Dr. Filardo is an Italian-born American. After obtaining a Ph.D. at Yale University, Dr. Filardo was hired at Baylor Scott & White Health in 2004 as an

---

[1]Writing this opinion presents an unusual problem because in this appeal from a summary judgment, most of the summary judgment record is under a sealing order that we must respect. *Kartsotis v. Bloch*, 503 S.W.3d 506, 510 (Tex. App.—Dallas 2016, pet. denied). However, we also must hand down

epidemiologist. In 2008, he helped found Baylor Health's epidemiology department and was appointed director of the department. In 2013, he was again promoted, this time to an endowed chair position for cardiovascular epidemiology.

In 2017, Dr. Filardo successfully secured a $12.8 million grant from the National Institute of Health for Baylor Health to enroll participants in a nationwide, multiyear study called "All of Us." Externally, Baylor Health was to coordinate its efforts as part of a consortium of four healthcare networks that spanned seven states, and the leader of this consortium was Henry Ford Health System. Internally, Dr. Filardo's efforts were to be coordinated with Baylor Scott & White Research Institute. Dr. Filardo was appointed as Baylor Health's principal investigator for the study.

It is undisputed that under Dr. Filardo's leadership, Baylor Health's enrollment efforts thrived. Dr. Filardo established numerous sites for the study across Texas. Baylor Health recruited far more participants than other members of the consortium and was in the top 5% of all participating groups in the country. There was also evidence that Dr. Filardo devised innovative staffing methods to which the success was partially attributable.

---

a public opinion explaining our decisions based on the record. *See* TEX. R. APP. P. 47.1, 47.3. Accordingly, we have attempted to preserve the confidentiality of the information and have made some references deliberately vague to avoid disclosing confidential details. *See MasterGuard, L.P. v. Eco Techs. Int'l LLC*, 441 S.W.3d 367, 371 (Tex. App.—Dallas 2013, no pet.).

However, internally, there were complaints about Dr. Filardo's management style. Dr. Filardo was described by both his peers and subordinates as territorial, aggressive, and unprofessional. According to Baylor Research's COO Jaime Walkowiak, there were also reports of deviations from study protocol.

In one complaint from 2016, a subordinate raised a number of red flags about Dr. Filardo's management, saying he often berated, threatened, and retaliated against staff to the point that they quit or requested transfers, he handled performance evaluations arbitrarily, and he compensated for a lack of personal diligence by making unreasonable demands of his staff. We detail this complaint more fully below. This employee requested a transfer away from Dr. Filardo's team.

In November 2017, Dr. Filardo's immediate supervisor, Dr. Andrew Masica, counseled him about his manner. According to Dr. Masica's memo from the meeting, Dr. Filardo defended his style, saying that a certain level of assertiveness was necessary to keep the study on track. Dr. Masica reminded him that conducting research as the principal investigator was a privilege conditioned on professional, collaborative behavior and cautioned Dr. Filardo that he needed to avoid negative interactions with his colleagues.

In December 2017 and January 2018, Baylor Health management received two more complaints concerning Dr. Filardo's behavior. In one, another of Dr. Filardo's employees criticized his unprofessional, rude, and demeaning behavior and relayed an anecdote in which a doctor had advised Dr. Filardo to go easier on his

–3–

team, but Dr. Filardo demurred, saying aggression was simply a byproduct of his personality and was a necessary expedient to success in the study. Another complaint came from the CFO of Baylor Health, who narrated how when she had attempted to talk to Dr. Filardo about regulatory compliance problems that could have jeopardized funding for the study, Dr. Filardo reacted in an angry and unprofessional fashion.

On February 1, 2018, Dr. Masica and Walkowiak held a meeting with Dr. Filardo to address the complaints. Dr. Filardo reacted on February 4, 2018, by sending a strongly worded email to Baylor Health's human resources department in which he objected to Baylor Research's interference with his efforts on the study. He also protested what he viewed as unfair and vague accusations of bad behavior, saying these accusations were likely rooted in prejudice against and stereotypes about Italian men, especially since Dr. Masica had made what Dr. Filardo described as "light hearted" jokes about Italians in the past.

On February 7, 2018, Dr. Masica again met with Dr. Filardo to discuss his management, including what Dr. Masica described as his aggressive interaction style, his refusal to comply with policy, and his efforts to prevent any other managers or departments from shaping the study except himself. When pressed about his behavior, Dr. Filardo again stated that this was simply his personality and that he was reluctant to change because he was concerned it would compromise the project's success.

The reports concerning Dr. Filardo subsided until an April 2019 conference call, when he reportedly yelled threats that he would fire whomever had reported an issue concerning documentation. The call led to a human resources investigation, in which three out of the eight witnesses to the call confirmed accusations regarding Dr. Filardo's hostility on the call and his general pattern of behavior, though five witnesses reported that the call was normal.

Another of Dr. Filardo's subordinates filed a complaint in May 2019. She reported being asked to manage ten worksites at once, and thus business at the sites was handled primarily by poorly trained interns without supervision, and the interns did not seem to understand the importance of following study protocol. This employee took issue with Dr. Filardo's harshness, saying team members were afraid to bring issues to him for fear of retaliation, and he was "constantly pointing fingers." She requested transfer to another department.

Later in May 2019, Dr. Masica again met with Dr. Filardo to counsel him. In a June 2019 performance review, Dr. Masica praised Dr. Filardo's enrollment efforts and ability to innovate, though he rated Dr. Filardo three out of five in most other categories and again noted his "intense and difficult" interactions with others.

According to Dr. Masica,, in November 2019 Baylor Health management informed him of a plan to execute a strategic reorganization eliminating his entire department, and the positions held by Dr. Filardo, Dr. Masica and his second in command for the study, Teresa Phan. The vice president of Baylor Health's human

resources department testified the decision to dissolve the department was not made by Dr. Masica, but by another member of Baylor Health's executive team, Dr. Alex Arroliga.

However, Dr. Masica and others testified Baylor Health put this reorganization plan on hold when, later in November 2019, Henry Ford Health System sent Baylor Health a formal notice to suspend work on the study. Apparently, NIH received reports of protocol deviations in Baylor Health's work, and asked Henry Ford Health System to investigate. According to Baylor Health's evidence, Dr. Filardo's cooperation was needed for the investigation, so it delayed the decision to dissolve the department.

On December 20, 2019, Henry Ford Health System formally completed its investigation and issued recommendations. Among its recommendations were the appointment of a co-principal investigator alongside Dr. Filardo, retraining Baylor Health staff assigned to the study, and direct oversight of Baylor Health's handling of the study by Henry Ford Health System.

On January 8, 2020, executives from Henry Ford Health System reportedly met with Walkowiak and privately relayed additional findings learned during their investigation but had not included in their formal recommendations: study staff felt they could not bring issues forward for fear of retaliation by Dr. Filardo, whom they described as a "tyrant."

On January 16, 2020, Dr. Filardo wrote an email to Walkowiak and others in Baylor Health and Research's management in which he categorically refused to consider the appointment of a co-principal investigator and protested that Henry Ford Health System had improperly conducted its investigation. Meanwhile, Dr. Masica accepted a position with another hospital system and gave his resignation notice to Baylor Health.

On January 23, 2020, Dr. Filardo wrote to the NIH to directly share concerns about Baylor Health's and Research's mismanagement of the study.

On January 30, 2019, Dr. Masica told Dr. Filardo his position was terminated. As Dr. Masica averred in his affidavit, "I was tasked with delivering the termination message, although I had no role in deciding when it would be delivered."

On March 12, 2020, Dr. Filardo filed charges of discrimination, retaliation, and hostile work environment with the Texas Workforce Commission.[2] He alleged that Dr. Masica and Walkowiak had targeted him due to their animus against his national origin and in retaliation for his disclosures about Baylor Health's mismanagement.

In December 2020, Dr. Filardo filed this lawsuit against Baylor Health. He alleged discrimination and hostile work environment on the basis of his race, sex,

---

[2]Filardo also reportedly filed similar charges with the Equal Employment Opportunity Commission, though this charge does not appear in our record and is not relevant to this appeal. For simplicity, we refer to the Texas charge as the sole charge for purposes of our discussion.

and national origin, as well as retaliation, in violation of the Texas Commission on Human Rights Act (TCHRA).

Baylor Health moved for traditional summary judgment, attacking Dr. Filardo's claims on many fronts. Dr. Filardo responded with evidence including his own declaration and the February 4, 2019 email he sent to human resources regarding, *inter alia*, Dr. Masica's Italian jokes and attempts to counsel Dr. Filardo for behavior, which Dr. Filardo viewed as a form of discrimination. Baylor Health moved to strike several portions of Dr. Filardo's declaration, and the trial court granted the motion and struck the majority of the declaration. The trial court also entered an agreed order that sealed Baylor Health's half of the summary judgment record, and granted summary judgment disposing of all Dr. Filardo's claims. This appeal followed.

## II.     SUMMARY JUDGMENT STANDARD

We review a grant of summary judgment de novo. *Trial v. Dragon*, 593 S.W.3d 313, 316 (Tex. 2019). If no grounds are specified for the ruling, we must affirm if any of the grounds on which judgment is sought are meritorious. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009).

In a traditional motion, the movant has the burden to show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 130 (Tex. 2018). A defendant is entitled to summary judgment if it conclusively negates at least one element of the plaintiff's claim. *Id.*

## III. THE SEALING ORDER, CONTEMPT, AND OTHER INITIAL MATTERS

Baylor Health notes that in Dr. Filardo's brief, he regularly cites to the portions of his declaration that were struck by the trial court, though he does not challenge the order striking this testimony. We do not consider this proof; evidence that has been excluded by written order of the trial court is not part of the summary judgment evidence to be considered. *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 294 (Tex. App.—Dallas 2009, no pet.).

Next, Baylor Health argues (1) Dr. Filardo inadequately briefed his issues due to the scarcity of record citations in his brief and (2) he failed to preserve several of the arguments he makes in support of his issues on appeal. We rule against Baylor Health on both arguments. Our appellate rules are designed to resolve appeals on the merits, and we liberally interpret and apply them whenever possible to achieve that aim. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). In view of said preference, we hold Dr. Filardo's appellate arguments are not so fatally deficient they are inadequately briefed and not so devoid of a foundation in the record they are unpreserved. *See* TEX. R. APP. P. 33.1; *Li v. Pemberton Park*

*Cmty. Ass'n*, 631 S.W.3d 701, 704 (Tex. 2021) (party sufficiently preserves an issue by arguing issue's substance and party may construct new *argument* on appeal to support an *issue* raised below).

Finally, Baylor Health observes Dr. Filardo attached two sealed documents to his brief, and Baylor Health asks, without citation to authority, for Dr. Filardo to be held in contempt for violation of the trial court's sealing order. We struck Dr. Filardo's brief and ordered him to refile the brief without any sealed content in the appendix. Dr. Filardo complied with the Court's order, and we decline to hold him in contempt.

## IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

In Dr. Filardo's first issue, he contests the summary disposal of his claims for hostile work environment in connection with his national origin, race, and sex. In the trial court, Baylor Health argued that Dr. Filardo had failed to exhaust his administrative remedies to the extent that he claimed hostile work environment based on race and sex; Baylor Health did not deny that Dr. Filardo had exhausted remedies as to his claim for hostile work environment based on national origin. The trial court granted summary judgment disposing of all three hostile work environment claims without stating grounds. Dr. Filardo argues on appeal that the trial court erred to the extent that it disposed of *any* of his hostile work environment claims due to failure to exhaust the administrative process.

In his charge with the Texas Workforce Commission, Dr. Filardo alleged hostile work environment, but he attributed the hostility only to his national origin. He checked the charge's boxes indicating that he faced discrimination on the basis of his national origin, as retaliation, and "other," below which he wrote "harassment and hostile work environment"; he left the boxes for race and sex discrimination empty. When asked to state the particulars of his complaint, Dr. Filardo wrote he "was discriminated against, harassed, retaliated against and subjected to a hostile environment based upon Claimant's national origin, Italian . . . ." Left entirely unmentioned in the factual portion of the charge were race and sex.

The exhaustion of administrative remedies is a prerequisite to filing suit under the TCHRA. *City of Waco v. Lopez*, 259 S.W.3d 147, 154 (Tex. 2008); *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 446 (Tex. 2004). "The universe of claims" a plaintiff may pursue in a TCHRA suit is defined "by the contours of the administrative process." *See Stingley v. Watson Quality Ford, Jackson, MS*, 836 Fed. App'x 286, 291 (5th Cir. 2020). "Courts should not condone lawsuits that exceed the scope of . . . exhaustion, because doing so would thwart the administrative process and peremptorily substitute litigation for conciliation." *Id.* Thus, the charge "must contain a sufficient factual basis to put the employer on notice of the existence and nature of the charges." *Williams-Pyro, Inc. v. Barbour*, 408 S.W.3d 467, 475 (Tex. App.—El Paso 2013, pet. denied).

–11–

"That said, courts considering the scope of [a charge] should not be stingy when assessing the litigable claims it encompasses." *Stingley*, 836 Fed. App'x at 291. We construe the charge liberally and not solely by the scope of the charge itself, but by the scope of the investigation that can reasonably be expected to grow out of the charge. *Melgar v. T.B. Butler Publ'g Co., Inc.*, 931 F.3d 375, 379 (5th Cir. 2019); *accord Alief Indep. Sch. Dist. v. Brantley*, 558 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (prescribing the "utmost liberality" in reviewing charge allegations for exhaustion so long as a factual basis is provided). The required factual basis might be supplied "either by checking the appropriate box or otherwise describing the alleged discriminatory conduct in the narrative section of their charge." *Jefferson v. Christus St. Joseph Hosp.*, 374 Fed. App'x 485, 490 (5th Cir. 2010); *accord Anderson v. Venture Express*, 694 Fed. App'x 243, 247 (5th Cir. 2017). Failure to fill in the appropriate box in the charge warrants summary judgment on exhaustion grounds only when coupled with a failure to describe the general nature of the claim in the charge's narrative section. *Williams v. Tarrant Cnty. Coll. Dist.*, 717 Fed. App'x 440, 445 (5th Cir. 2018).

We agree Dr. Filardo exhausted his administrative remedies for his national origin hostile work environment claims. Dr. Filardo complained of hostile work environment and tied that complaint to national origin both by checking the "national origin" box and alleging he was "subjected to a hostile environment based upon

–12–

Claimant's national origin, Italian." To that extent, we sustain Dr. Filardo's first issue.

However, Dr. Filardo did not check the boxes on the charge that could have indicated his claims had a race- or sex-oriented dimension. Further, the narrative portion of his charge did not associate the hostility he faced with his race or sex—it said nothing about those traits. The charge solely mentioned hostile work environment on the basis of national origin, and thus only that claim was exhausted. *See Cross v. Napolitano*, No. CIV.A. H-08-0910, 2009 WL 3246611, at *1 (S.D. Tex. Oct. 5, 2009) ("Although Cross did administratively assert a *race-based* hostile environment claim, he never claimed a hostile work environment based on age or gender as currently alleged in his Complaint. Thus[,] there is no subject matter jurisdiction over such claims in this court.").

Because nothing in Dr. Filardo's charge could have apprised Baylor Health of an allegation it had subjected him to hostility on the basis of race or sex, he failed as a matter of law to exhaust his administrative remedies for his race- and sex-based hostile work environment claims. The trial court was correct to grant summary judgment on those claims. To that extent, we overrule Dr. Filardo's first issue.

## V. DISCRIMINATION AND RETALIATION

In his second and fourth issues, Dr. Filardo appeals the summary judgment disposing of his claims for discrimination and retaliation under the TCHRA. Dr. Filardo argues that he satisfied his burden with respect to all elements of the prima

–13–

facie case for both claims and also produced evidence that Baylor Health's reasons for its adverse actions were pretextual.

With respect to his discrimination and retaliation claims, although Dr. Filardo complains of several employment actions, only one was adverse, his termination. As to his termination, Dr. Filardo failed to rebut Baylor's legitimate, non-discriminatory reason for his discharge. As to his claim of hostile work environment, Dr. Filardo failed to produce evidence that his treatment was based on a protected characteristic. Consequently, the trial court was correct to summarily dispose of both claims.

## A.    General Applicable Law

The TCHRA "is a comprehensive fair employment practices act and remedial scheme, modeled after Title VII of the federal Civil Rights Act of 1964 (Title VII) that provides the framework for employment discrimination claims in Texas." *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 502–03 (Tex. 2012) (footnote omitted). The TCHRA "was enacted to address the specific evil of discrimination and retaliation in the workplace," and was designed to "conform with parallel federal employment discrimination laws." *Lopez*, 259 S.W.3d at 153–54. While we consider the TCHRA's plain language and state precedent in interpreting the statute, we also look to federal law for interpretive guidance about whether the TCHRA satisfies its legislative mandates executing the policies of Title VII and subsequent

amendments. *Crutcher v. Dall. Indep. Sch. Dist.*, 410 S.W.3d 487, 492 (Tex. App.—Dallas 2013, no pet.) (quoting TEX. LABOR CODE § 21.001(1)).

While a retaliation claim may be proved through direct or circumstantial evidence, "motives are often more covert than overt, making direct evidence of forbidden animus hard to come by." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012). In the absence of direct evidence of discrimination, the employee may rely on the *McDonnell Douglas* burden-shifting analysis to prove his case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Under this framework, the plaintiff is entitled to a presumption of discrimination if he meets the minimal initial burden of establishing a prima facie case of discrimination. *Garcia*, 372 S.W.3d at 634. To make out a prima facie case for discriminatory termination, the plaintiff must show he or she was (1) a member of the class protected by the TCHRA, (2) qualified for his or her employment position, (3) terminated by the employer, and (4) treated less favorably than similarly situated members of the class. *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008).

Once a prima facie case is established, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Crutcher*, 410 S.W.3d at 493. If the employer does so, the burden shifts back to the plaintiff to demonstrate the employer's reason is a pretext for discrimination. *Id.* To carry this burden, the plaintiff must rebut each

–15–

nondiscriminatory or nonretaliatory reason articulated by the employer. *Id.* (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007)).

The same burden-shifting analysis used in discrimination claims is also used in a retaliation claim. *McCoy v. Tex. Instruments, Inc.*, 183 S.W.3d 548, 555 (Tex. App.—Dallas 2006, no pet.). To establish a prima facie case of retaliation, a plaintiff must show that (1) he or she engaged in an activity protected by the TCHRA, (2) he or she experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. *Alamo Heights Indep. Sch. Dist. v. Clark,* 544 S.W.3d 755, 782 (Tex. 2018). If the plaintiff meets his or her burden to establish a prima facie case of retaliation, the burden shifts to the defendant to demonstrate a legitimate, nonretaliatory purpose for the adverse employment action. *Id.* The plaintiff then assumes the burden to present proof that the stated reason was pretextual. *Id.*

## B.    Adverse Employment Action

To evaluate Dr. Filardo's case on pretext for discrimination and retaliation, it is necessary to explore the adverse employment aspect of Dr. Filardo's prima facie case because he alleges there were three such actions, and Baylor Health's reasons for taking each action vary. We begin by determining which, if any, of these actions constituted adverse employment action.

The TCHRA does not protect employees from all adverse employment action, only from actions that are "materially adverse." *Alamo Heights,* 544 S.W.3d at 788..

–16–

Materially adverse "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* "This objective materiality requirement is necessary to separate significant from trivial harms." *Id.* (internal quotation omitted).

According to Dr. Filardo, the first adverse employment action he suffered was Baylor Health's refusal to investigate the complaints of discrimination, harassment, and retaliation that he filed with human resources. He refers to an email he sent to the head of Baylor Health's human resources department on February 4, 2018. The main themes of this email were to protest his conflict with Baylor Health leadership, their interference with his management of the study, and their unfair criticism of his behavior, which Dr. Filardo attributed to his national origin.

We note Dr. Filardo produced no evidence that Baylor Health refused to investigate these complaints. Regardless, viewing matters in the light most favorable to Dr. Filardo, we assume for discussion this email reflects a complaint of discrimination that Baylor Health refused to investigate. But, it is well established in Texas federal courts that a failure to investigate an employee's complaint is not an adverse employment action for purposes of either a discrimination or retaliation claim. *See Butler v. Collins*, No. 3:18-CV-00037-E, 2023 WL 318472, at *14 (N.D. Tex. Jan. 19, 2023); *Gibson v. Hoshizaki Am., Inc.*, No. 4:20-CV-046-A, 2021 WL 200523, at *6 n.7 (N.D. Tex. Jan. 20, 2021); *Leckemby v. Greystar Mgmt. Servs., LP*, No. 1:13-CV-873-DAE, 2015 WL 3408667, at *7 (W.D. Tex. May 26, 2015).

–17–

One outlier from this general rule appears to be *Marshall v. McDonough*, a case in which a magistrate judge reasoned a failure to investigate a claim was potentially actionable when the failure was concretely identified as the catalyst for the plaintiff's termination, but said circumstance is not present in this case. No. 2:20-CV-215-M-BR, 2021 WL 3917001, at *7 (N.D. Tex. July 15, 2021), *report & rec. adopted*, No. 2:20-CV-215-M-BR, 2021 WL 3912804 (N.D. Tex. Sept. 1, 2021). We agree with *Butler*, *Gibson*, and *Leckemby* and apply their holdings here: the failure to investigate Dr. Filardo's complaint was not actionable as adverse employment action.

Next, Dr. Filardo argues that Baylor Health's appointment of a coequal principal investigator for the study constituted an adverse employment action. However, Dr. Filardo produced no admissible evidence to show that Baylor Health did indeed appoint another principal investigator alongside him before his position was terminated. We therefore do not consider whether this move might have constituted an adverse employment action.

Finally, Dr. Filardo submits that his termination constituted an adverse employment action. "Termination is unquestionably a materially adverse employment action." *Clark*, 544 S.W.3d at 788–89.

We conclude that Dr. Filardo faced only one adverse employment action in the form of his termination.

**C.  Legitimate, Nondiscriminatory, and Nonretaliatory Reasons for the Termination**

We assume arguendo Dr. Filardo produced evidence sufficient to establish the remainder of his prima facie case.  Under this assumption, the burden shifted to Baylor Health to produce evidence of a legitimate, nondiscriminatory, and nonretaliatory reason for the termination.

"[I]t is relatively easy . . . for a defendant to articulate legitimate, nondiscriminatory reasons for his decision . . . ." *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 811 (5th Cir. 1991).  To satisfy its burden, "[t]he employer need only articulate a lawful reason, regardless of what its persuasiveness may or may not be." *Bodenheimer v. PPG Indus., Inc.* 5 F.3d 955, 958 (5th Cir. 1993).  The burden of production determination necessarily precedes the creditability-assessment stage, which occurs later. *Id.*

Baylor Health offered two reasons for its decision to terminate Dr. Filardo.  The first was his pattern of behavior—namely, his domineering, aggressive, and unprofessional manner and his tendency to berate subordinates and retaliate against those who questioned his methods.  Despite multiple attempts to counsel Dr. Filardo, there was evidence he continued this pattern of behavior until his termination.  When confronted about his behavior, Dr. Filardo explained his temperament simply represented his personality and he was reluctant to change his management style for fear of undercutting his efficacy.  In the end, this behavior resulted in multiple documented internal complaints and requests to transfer away from Dr. Filardo's

department, and still other concerning reports from staff that were relayed to Baylor Health by the consortium lead of the study, Henry Ford Health System, following its investigation into Dr. Filardo's management. Dr. Filardo's pattern of behavior constituted a legitimate, nondiscriminatory, and nonretaliatory reason for the firing. *See Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) (citing confirmed reports of unprofessional behavior by a manager as a nondiscriminatory reason); *see also Gill v. DIRTT Env't Sols., Inc.*, 790 Fed. App'x 601, 605 (5th Cir. 2019) (same as to "numerous complaints from [the plaintiff's] colleagues regarding her unprofessional behavior"); *Gudger v. CITGO Petro. Corp.*, 574 Fed. App'x 493, 497 (5th Cir. 2014) (same as to "escalating communication and behavioral problems"); *Barrera v. Worldwide Flight Servs., Inc.*, 220 Fed. App'x 253, 254 (5th Cir. 2007) (same as to "harassing and intimidating behavior").

As another reason for the termination, Baylor cites its decision to eliminate Dr. Masica's and Dr. Filardo's entire department as part of a system-wide reorganization, for which Dr. Masica was not the decisionmaker. It is undisputed that the department was indeed liquidated and that Dr. Masica himself, whom Dr. Filardo charged with discriminatory intent, found a position with a different hospital system in the leadup to Dr. Filardo's termination. It is also undisputed Dr. Filardo's number two in command for the study, Phan, was also fired immediately after Dr. Filardo's termination. A reduction-in-force is a legitimate, nondiscriminatory, and nonretaliatory reason for an employee's termination. *City of Dallas v. Siaw-Afriyie,*

No. 05-19-00244-CV, 2020 WL 5834335, at *10 (Tex. App.—Dallas Oct. 1, 2020, no pet.) (mem. op.); *McCoy*, 183 S.W.3d at 556.

We conclude Baylor Health produced two legitimate, nondiscriminatory, and nonretaliatory reasons for Dr. Filardo's termination.

## D. Pretext

The burden then shifted back to Dr. Filardo to present evidence creating a genuine fact issue as to whether the reasons stated by Baylor Health were not its true reasons, but instead were pretextual or not credible. *Crutcher*, 410 S.W.3d at 497. An employer is entitled to judgment as a matter of law if the record conclusively establishes some other permissible reason for the employer's decision, or if the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination or retaliation had occurred. *See id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). The issue at the pretext stage is not whether the employer made an erroneous decision; it is whether the decision, even if incorrect, was the real reason for the employment determination. *Id.* The employer is entitled to be unreasonable so long as it does not act with prohibited animus. *Id.* (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)).

Dr. Filardo failed to meet this burden. Indeed, this case lacks any of the typical forms of pretext evidence. Instead, the available record evidence suggests

–21–

the nondiscriminatory and nonretaliatory reasons Baylor Health proposed—Dr. Filardo's unprofessional behavior and a system-wide reorganization that liquidated his entire department—were its actual motivation to terminate Dr. Filardo.

Apparent inconsistencies between the explanations an employer has offered may be useful evidence on pretext, but here were no such inconsistencies. *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007); *see Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 413 (5th Cir. 2007). Rather, Baylor Health's explanation appears to have remained consistent over time: before the firing, Baylor Health repeatedly counseled Dr. Filardo on his aggressive manner, and since the firing, Baylor Health has continued to offer the same two reasons for its decision as it does on appeal.

Failure to follow established policy and law may also contribute toward a pretext fact issue. *See Smith v. Xerox Corp.*, 371 Fed. App'x 514, 517 (5th Cir. 2010) ("What was not disputed, however, was that Xerox's policies generally state that counseling and coaching of employees should occur prior to the issuance of formal warning letters, yet Xerox offered no documentation supporting Jankowski's claim that he did counsel Smith before placing her on probation."). Here, however, there was no evidence that Baylor Health deviated from policy or this state's at-will employment laws by ending Dr. Filardo's employment.

And lack of documentation otherwise regularly kept may tend to show pretext. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015)

(citing *Laxton v. Gap Inc.*, 333 F.3d 572, 580 (5th Cir. 2003), and *Evans v. City of Houston*, 246 F.3d 344, 355–56 (5th Cir. 2001)) ("Here, as in *Laxton* and *Evans*, we face a lack of contemporaneous documentation coupled with evidence that such documentation should exist. As in *Evans*, such documentation was created after Burton came within the protections of the ADA and after the termination decision. Under the circumstances, this is additional circumstantial evidence of pretext."). But the record contains no shortage of contemporaneous documentation about Dr. Filardo's behavior, requests to transfer out of his department, an outside health system's investigation that confirmed the complaints and yielded still others, and management's attempts to adjust his course—during which Dr. Filardo seemed to dismiss the complaints. These documented complaints and their confirmation through a good faith investigation directly supported Baylor Health's stated concerns about Dr. Filardo's behavior. *See Gudger*, 574 Fed. App'x at 497–98 (citing number of behavior complaints and good faith investigation thereof as evidence that cut against pretext); *Barrera*, 220 Fed. App'x at 254 (same).

As for the other reason Baylor Health offered for the termination—its decision to downsize the entire department—Dr. Filardo relies on his outstanding performance metrics and qualifications as a means of establishing this reason was pretext. *See, e.g.*, *Kanen v. DeWolff, Boberg & Assocs., Inc.*, No. 05-20-00126-CV, 2022 WL 152527, at *4 (Tex. App.—Dallas Jan. 18, 2022, pet. denied) (mem. op.). However, "[i]n many reduction in force cases, the plaintiff's qualifications for his

–23–

job are less relevant since some employees will have to be let go despite competent performance." *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 124 (5th Cir. 1992). Dr. Filardo produced no evidence other, less qualified employees were spared from the department's liquidation—and again, an apparent cause of the liquidation was Dr. Masica himself, whom Dr. Filardo alleged to be one of the two actors guilty of discrimination and retaliation. *See id.*

Inculpatory comments not amounting to direct evidence of animus may still potentially be considered as circumstantial evidence of pretext if certain conditions are met, *see Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475–76 (5th Cir. 2015), and nonverbal expressions of animus may serve the same function under certain circumstances, *see Khalfani v. Balfour Beatty Comtys., L.L.C.*, 595 Fed. App'x 363, 366 (5th Cir. 2014). In this case, though, the only evidence of communication in this vein is Dr. Filardo's own self-serving proof, in which he objected to Dr. Masica making jokes about Italians that Dr. Filardo himself described as "light-hearted." *See Jackson*, 602 F.3d at 379–80 (concluding that self-serving testimony and a "stray remark" with a discriminatory overtone were insufficient to create a fact issue on pretext). Moreover, in his declaration, Dr. Masica denied making "any jokes, light-hearted or otherwise, about Italians to Dr. Filardo," and there was testimony that Dr. Masica was not the ultimate decisionmaker in Dr. Filardo's termination. *See Goudeau*, 793 F.3d at 475–76 (explaining that for an off-base comment to be a circumstantial "ingredient in the overall evidentiary mix," they

must show animus "on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker"). These alleged jokes are no evidence of pretext.

There was also no pattern and practice evidence that Baylor Health had discriminated or retaliated against anyone else. "[C]ircumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices—evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant." *Kelly v. Boeing Petro. Servs., Inc.*, 61 F.3d 350, 360 (5th Cir. 1995). "In discrimination cases, however, such background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." *Id.* This critical evidence is lacking in our record.

In sum, Dr. Filardo failed to produce any admissible evidence to create a fact issue on pretext, and Baylor Health conclusively established the credibility of its stated reasons. Baylor Health was therefore entitled to summary judgment on Dr. Filardo's discrimination and retaliation claims. We overrule Dr. Filardo's second and fourth issues.

## VI. HOSTILE WORK ENVIRONMENT

In his third issue, Dr. Filardo contests summary judgment on his national origin hostile work environment claim. We conclude Baylor Health conclusively

established the alleged harassment Dr. Filardo faced was not driven by prohibited animus but by Baylor Health's legitimate business needs.

A hostile work environment claim entails ongoing harassment, based on the plaintiff's protected characteristic, so severe or pervasive it alters the conditions of employment and creates an abusive working environment. *In re Parkland Health & Hosp. Sys. Litig.*, No. 05-17-00670-CV, 2018 WL 2473852, at \*8 (Tex. App.— Dallas June 4, 2018, no pet.) (mem. op.); *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 646 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The elements of a prima facie case of hostile work environment are (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on the protected characteristic; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Parkland*, 2018 WL 2473852, at \*8; *Anderson*, 458 S.W.3d at 646. An employee complaining of harassment by a supervisor need only show the first four elements. *Parkland*, 2018 WL 2473852, at \*8.

According to Dr. Filardo, the harassment consisted of the following:

- Dr. Masica occasionally made what Dr. Filardo described as "light-hearted" Italian jokes, but after Dr. Masica counseled Dr. Filardo on his behavior, Dr. Filardo came to view these jokes as discriminatory;

- Baylor Research attempted to assert control over the study "as if the responsibility of the execution of the study has been awarded to them";

- Dr. Masica told Dr. Filardo that he could be removed as the principal investigator if he were not careful;

- Dr. Filardo experienced months of "aggressive back and forth" when negotiating the contracts for the study, whereas all other institutions participating in the study completed similar negotiations in just a few weeks;

- Baylor Health delayed payments for some expenditures that Dr. Filardo requested, such as phlebotomy training for his staff;

- When he had marketing materials printed for the study, he initially put Baylor Health's logo on the materials; Baylor Research intervened in the second run of printing, paused the process, and instructed that Baylor Research's logo should be included instead; and

- On February 1, 2018, Walkowiak and Dr. Masica had a meeting with Dr. Filardo to counsel him concerning his behavior.

Even assuming these incidents represented severe and pervasive harassment, Baylor Health has established as a matter of law these incidents had nothing to do with Dr. Filardo's nationality. To be actionable, the harassment must be based on a protected characteristic—here, national origin. *Id.* The Fifth Circuit has held that harassment motivated by something other than a plaintiff's membership in a

protected class lies beyond the scope of our discrimination laws. *Stingley*, 836 Fed. App'x at 289. "It is not enough to establish that a plaintiff is a member of a protected class and that he has been harassed—the plaintiff must show that he was harassed *because* of his membership in a protected class." *Id.* at 288 (cleaned up); *see Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 586 (5th Cir. 2020). Applying similar thinking, one Texas district court granted summary judgment on a hostile work environment claim because the alleged acts of harassment were "not facially racial" and the plaintiff had offered no evidence to "link[]" the acts "to her race." *Daniels v. BASF Corp.*, 270 F. Supp. 2d 847, 855 (S.D. Tex. 2003); *see Barnes v. Prairie View A & M Univ.*, No. 14-15-01094-CV, 2017 WL 2602723, at *4 (Tex. App.—Houston [14th Dist.] June 15, 2017, pet. denied) (mem. op.) ("As to Barnes's other allegations of harassing conduct, which primarily involved her supervisor, she does not point to any evidence that they were racially motivated or part of a pattern of race-based harassment.").

Other federal courts of appeal have evaluated hostile work environment claims under the same rubric. *See, e.g.*, *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511–12 (6th Cir. 2011); *Wood v. Univ. of Pittsburgh*, 395 Fed. App'x 810, 815 (3d Cir. 2010); *Enwonwu v. Fulton-Dekalb Hosp. Auth.*, 286 Fed. App'x 586, 602 (11th Cir. 2008). "Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). "It is therefore important in hostile work

–28–

environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Id.* Otherwise, we risk becoming "a court of personnel appeals." *Id.*

"To support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir. 2022). "Although a connection between the harassment and the plaintiff's protected class need not be explicit, there must be some connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Id.* (internal quotation omitted). "Nevertheless, forms of harassment that might seem neutral in terms of race can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Id.* (cleaned up); *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999) ("Facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct.").

Applying these principles, Dr. Filardo's hostile work environment claim fails as a matter of law. Dr. Filardo produced no evidence of animus that might fuel a hostile work environment claim except Italian jokes made by his supervisor prior to 2018. But Dr. Filardo himself described these jokes as "light hearted," and we have

already determined that these jokes were not circumstantial evidence of animus. By contrast, the six other forms of alleged harassment by Baylor Health's upper management—which consisted of attempting to assert control over the study's financing, marketing, personnel, and contractual foundations—were facially neutral and free from prohibited animus. Dr. Filardo offered nothing to show that these seemingly legitimate business moves were "infected by discriminatory animus." *See Alfano*, 294 F.3d at 377; *cf. Melvin v. Barr Roofing Co.*, 806 Fed. App'x 301, 309 (5th Cir. 2020) ("Consistent racial slurs are certainly based on race."); *Henry v. CorpCar Servs. Hous., Ltd.*, 625 Fed. App'x 607, 612 (5th Cir. 2015) (collecting cases in which overt discriminatory overtones surrounding the harassment were held sufficient to establish a basis in a protected trait).

Conversely, Baylor Health offered proof showing its actions were unrelated to Dr. Filardo's Italian heritage and were made to bring the study and Dr. Filardo's management methods back into balance. This evidence included the numerous complaints, the attempts to correct his behavior, and the investigation that halted Baylor Health's participation in the study. For instance, in a complaint from August 2016, one of Dr. Filardo's subordinates requested a transfer away from his department because:

- he often berated staff, causing several of the interns who executed the study to quit or request transfers;

- the subordinate was reluctant to go to human resources because she feared retaliation since Dr. Filardo had threatened to fire them or strip their bonuses;

- Dr. Filardo rationed and arbitrarily assigned good performance ratings using a random number generator;

- her original supervisor transferred out of the department after negative interactions with Dr. Filardo;

- Dr. Filardo and others in the study team's management routinely arrived at the office as late as 10 a.m. or 1 p.m. and left as early 3 or 4 p.m.;

- Dr. Filardo frequently failed to communicate with the lower-tiered employees, yet asked them to be available by phone 24/7, leading to calls after midnight;

- Dr. Filardo took six months of combined sick leave and vacation in the early part of one year, and authorized three months of leave for one team manager below him and a month off for another manager, yet denied lower-tiered staff any vacation at all over the summer or Christmas; and

- during their frequent absences, the study team's management shifted the bulk of their work onto the person requesting the transfer while offering her no additional compensation.

Following this report, Dr. Masica documented a private meeting in which he counseled Dr. Filardo on his behavior, but Dr. Filardo dismissed the feedback,

saying that his methods were necessary to keep the study on track. And during the term of the study from 2017 through 2019, there were many similar grievances and attempts to correct Dr. Filardo's behavior, but Dr. Filardo summarily dismissed both the complaints and the counseling. Even viewing matters in the light most favorable to Dr. Filardo, each of the forms of "harassment" that Dr. Filardo faced represented no more than an attempt to correct the employment problems that these grievances reflected, none of which had an apparent connection to animus against a protected trait. It is not within the letter or purpose of our discrimination laws to prevent an employer from taking corrective action to address grievances of this kind unless prohibited animus is what motivates them. *See Stingley*, 836 Fed. App'x at 289.

Because Baylor Health conclusively proved the alleged harassment was not driven by prohibited animus but by the health system's legitimate business needs, it was entitled to summary judgment on Dr. Filardo's hostile work environment claim on the basis of national origin. We overrule Dr. Filardo's third issue.

We affirm the trial court's summary judgment.


/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE


211066F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
### JUDGMENT

GIOVANNI FILARDO, Appellant

No. 05-21-01066-CV V.

BAYLOR SCOTT AND WHITE
HEALTH, Appellee

On Appeal from the 116th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-20-18611.
Opinion delivered by Chief Justice
Burns. Justices Molberg and Reichek
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee BAYLOR SCOTT AND WHITE HEALTH recover its costs of this appeal from appellant GIOVANNI FILARDO.

Judgment entered this 18th day of August 2023.